Filed 2/20/14

# IN THE SUPREME COURT OF CALIFORNIA

MARK T. FAHLEN,                               )
                                              )
    Plaintiff and Respondent,             )
                                              )            S205568
    v.                                    )
                                              )      Ct.App. 5 F063023
SUTTER CENTRAL VALLEY                         )
HOSPITALS et al.,                             )
                                              )      Stanislaus County
    Defendants and Appellants.            )   Super. Ct. No. 662696
_____)

In *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 (*Westlake*), we held that, before a physician may bring a common law tort action directed against a hospital's quasi-judicial decision to terminate the physician's staff privileges, he or she must first exhaust all internal hospital procedures to reverse the decision, and, if this fails, must prevail in court in a mandamus proceeding to have the decision set aside.  In two more recent decisions, however, we concluded that persons filing damage suits authorized by certain whistleblower statutes — laws forbidding employer retaliation against workers who have reported fraud, danger, corruption, waste, or malfeasance — did not have to exhaust available administrative and mandamus remedies before seeking relief in court.  (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760 (*Runyon*); *State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963 (*Arbuckle*); but see *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876 (*Miklosy*).)

1

Here, as in *Westlake*, defendant Sutter Central Valley Hospital, through its quasi-judicial peer review procedures, terminated plaintiff Mark T. Fahlen's physician's staff privileges. He sued the hospital and its chief operating officer, seeking damages, reinstatement, and other relief on multiple theories. Among other things, his complaint claims the hospital's action constituted retaliation for his reports of substandard performance by hospital nurses, and thus violated Health and Safety Code section 1278.5.[1]

Defendants moved to dismiss the action on grounds, among others, that plaintiff could not bring a civil suit under section 1278.5 unless he first succeeded by mandamus in overturning the hospital's action. The trial court denied the motion. In a published decision, the Court of Appeal reversed in part. The appellate court held that plaintiff could pursue those claims based on section 1278.5, rather than on the common law, even though he had not previously sought and obtained a mandamus judgment against the hospital's decision. This holding conflicted with that of another appellate decision, *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 (*Nesson*). We granted defendants' petition for review for the sole purpose of resolving the conflict.

We conclude that when a physician claims, under section 1278.5, that a hospital's quasi-judicial decision to restrict or terminate his or her staff privileges was itself a means of retaliating against the physician "because" he or she reported concerns about the treatment of patients, the physician need not first seek and obtain a mandamus judgment setting aside the hospital's decision before pursuing a statutory claim for relief. Section 1278.5 declares a policy of encouraging

---

[1]    Unless otherwise specifically noted, all further unlabeled statutory references are to the Health and Safety Code.

2

workers in a health care facility, including members of a hospital's medical staff, to report unsafe patient care. The statute implements this policy by forbidding a health care facility to retaliate or discriminate "in any manner" against such a worker "because" he or she engaged in such whistleblower action. (§ 1278.5, subd. (b).) It entitles the worker to prove a statutory violation, and to obtain appropriate relief, in a civil suit before a judicial fact finder.

Section 1278.5 does not expressly or impliedly condition this right on a prior successful mandamus challenge to a hospital's quasi-judicial decision to restrict or terminate the whistleblower's medical staff privileges. Indeed, the statute includes terms indicating the Legislature's understanding and expectation that a medical staff member's whistleblower suit might begin and go forward while the hospital's proceedings against the physician were still pending.

Moreover, such a condition would seriously undermine the Legislature's purpose to afford a whistleblower on a hospital medical staff the right to sue. A hospital disciplinary proceeding against a member of the medical staff is ostensibly focused on concerns about the physician's professional fitness, not on redressing his or her claims of whistleblower retaliation. Indeed, plaintiff asserts here that the hospital proceeding was the very means of retaliation. By concluding, on limited mandamus review, that the administrative evidence of the physician's deficiencies was sufficient to support the hospital's decision, the mandamus court could thus entirely and permanently foreclose the physician's statutory right to litigate, in court, his or her distinct claim that whistleblower retaliation was a reason for the exclusionary effort.

The Legislature cannot have intended, sub silentio, to so limit the physician's statutory right to persuade a judicial fact finder, in the first instance, that the adverse hospital action actually occurred because of, and in retaliation for, his or her efforts to report concerns about the hospital's quality of care. We thus

3

conclude, as to the narrow issue before us, that there is no such necessary condition to a physician's statutory medical whistleblower claim.

Of course, both the California Legislature and the United States Congress have recognized that legitimate, properly conducted hospital peer review proceedings are themselves a crucially important means of protecting patients against unsafe hospital medical care. As we discuss below, both state and federal statutes seek to encourage participation in medical peer review activities by providing qualified tort immunity for those involved in reasonably founded medical peer review decisions. Even aside from these statutory limitations, "mixed motive" cases may arise in which such proceedings, though instigated at least in part as retaliation against a whistleblower, nonetheless disclose substantial legitimate medical grounds for restricting or terminating a physician's hospital staff privileges — reasons that would properly have produced the same decision in the absence of retaliatory animus.

Future litigants may argue that proper attention to these various concerns should affect the trial timing, the issues, and the available remedies in an individual physician's whistleblower suit under section 1278.5. Such matters, however, are beyond the scope of the narrow question before us here. We pass no final judgment upon them, but await their appropriate future development.

**FACTS AND PROCEDURAL BACKGROUND**

Plaintiff physician, a kidney specialist, was employed by Gould Medical Group (Gould) in Modesto. Beginning in 2004, he was granted nonprovisional staff privileges at Memorial Medical Center (Hospital), which is operated by defendant Sutter Central Valley Hospital (Sutter). Twice in 2004 and twice in 2006, plaintiff argued with Hospital nurses who assertedly failed to follow his patient treatment instructions. From August 2007 through April 2008, plaintiff had six other clashes with particular Hospital nurses about patient care. On

4

several of these occasions, he reported to nursing supervisors, or in writing to the Hospital's administration, that nurses had been insubordinate and had provided substandard care.

In early May 2008, after the last of these clashes, defendant Steve Mitchell, the Hospital's chief operating officer, contacted Gould's medical director about plaintiff's disruptive interactions with the Hospital's nursing staff. Mitchell hoped that Gould's director would meet with plaintiff, that plaintiff would get angry during the meeting, that Gould's director would react by terminating plaintiff's employment, and that plaintiff would then leave town. This, Mitchell envisioned, would obviate the need for peer review proceedings to determine the status of plaintiff's Hospital staff privileges. Gould did terminate plaintiff's at-will employment contract on May 14, 2008. As a result, plaintiff's medical malpractice insurance was cancelled, leaving him immediately unable to treat patients at the Hospital.

Because he intended to open a private practice in Modesto, plaintiff scheduled a meeting with Mitchell to determine the status of his Hospital staff privileges. After the meeting was scheduled, but before it occurred, Mitchell declared in an e-mail to the Hospital's chief executive officer that plaintiff "does not get it" — meaning, as Mitchell admitted, that plaintiff was going to lose his privileges at the Hospital. The chief executive officer responded that it "[l]ooks like we need to have the Medical Staff take some action on his MedQuals!!! Soon!"

At his May 30, 2008, meeting with plaintiff, Mitchell told plaintiff he should resign from the Hospital staff and leave town, or the Hospital would begin an investigation and peer review proceeding that would result in a report to the Medical Board of California. The Hospital thereafter convened an ad hoc investigative committee, which presented a report to the Hospital's medical

5

executive committee (MEC) — the body responsible, under the Hospital's bylaws, for reviewing staff privilege applications and initiating corrective or disciplinary action against medical staff. At its meeting on August 11, 2008, the MEC recommended against renewal of plaintiff's privileges. The MEC notified plaintiff of its decision and his right to contest it.

Plaintiff requested a hearing. The MEC informed him by letter that a judicial review committee (JRC) would conduct the review hearing in accordance with the procedures set forth in the bylaws. The letter also included a statement of charges, including 17 incidents of disruptive or abusive behavior toward Hospital staff from 2004 through 2008, and one incident of "abusive and contentious behavior" during a 2008 interview with the ad hoc investigating committee.

The JRC, composed of six physicians with Hospital staff privileges, conducted an extensive evidentiary hearing in 13 sessions between October 2009 and May 2010. An attorney acted as hearing officer.

In unanimously adopted findings, issued on June 14, 2010, the JRC reversed the MEC's decision. The JRC reached the following conclusions: The evidence failed to show plaintiff was professionally incompetent or had engaged in behavior endangering the delivery of patient care. To the extent anyone's conduct was detrimental to such care, the nursing staff was more to blame than plaintiff. Several of his interactions with the nursing staff had been "inappropriate and [un]acceptable," but the Hospital should have intervened sooner and failed in its responsibility to do so. As a result, the Hospital omitted to consider intermediate steps short of loss of staff privileges, such as anger management counseling. Moreover, after the MEC recommended termination of privileges, plaintiff had voluntarily obtained psychological counseling and attended anger management sessions, and his behavior had appreciably improved. Accordingly, the MEC had failed to sustain its burden of proving that its recommendation not to

6

reappoint plaintiff to the Hospital's medical staff for "medical disciplinary cause" was "reasonable and warranted."

Under the Hospital's bylaws, the final decision whether to terminate a physician's staff privileges rests with its board of trustees (Board).  The Board concluded it needed the JRC's assistance to fulfill its duties in plaintiff's case.  By a letter dated September 16, 2010, the Board propounded a series of detailed questions to the JRC, asking whether each alleged incident of misconduct occurred, what findings the JRC had made with respect to each charge presented by the MEC, and "[w]hat evidence provided at the [JRC] hearing was considered" in making these findings.  The JRC was asked to respond within 30 days.

After considering the Board's request, the JRC concluded it was unreasonable, because it would require JRC members to read the entire hearing transcript and all the documentary evidence.  The JRC advised that the Board would "have to proceed on the basis of all the materials available to it at this time, including the Findings of Fact and Conclusion that [were] previously rendered by the [JRC]."

In a letter to plaintiff's counsel, dated January 7, 2011, the Board conveyed its decision reversing the JRC.  The Board criticized the JRC's findings and conclusions as "unlinked to any factual support in the hearing record."  From its own review of the evidence, the Board concluded that plaintiff's conduct "was inappropriate and not acceptable, [and was] directly related to the quality of medical care at the Hospital."

Plaintiff did not seek direct judicial review of the Board's decision by means of a petition for writ of mandamus to set the decision aside.  The Hospital

7

filed with the Medical Board of California a so-called 805 report of its action, as required by Business and Professions Code section 805.**2**

On March 9, 2011, plaintiff filed the instant complaint against Sutter, Mitchell, and various Doe defendants. The complaint alleged generally that defendants had caused his medical group (Gould) to fire him, had tried to run him out of Modesto, and had terminated his staff privileges "because of his complaints about the substandard, insubordinate and unprofessional nursing care he had observed at [the Hospital], conduct which endangered patient care and patient safety." On various theories, the complaint sought reinstatement to the Hospital's medical staff; a declaration of defendants' bad faith; economic and noneconomic compensation, including lost wages; costs and attorney fees; punitive damages; and other appropriate relief permitted by law.

The first count stated a claim under section 1278.5, the health care facility whistleblower statute. The second count similarly prayed for a declaration of bad faith under Business and Professions Code section 803.1, subdivision (b)(6). In the sixth count, plaintiff asserted a violation of Business and Professions Code sections 510 and 2056, which condemn a health care facility's retaliation against a physician who "advocate[s] for medically appropriate health care." Finally, the

---

**2** This statute requires a licensed health care facility to file an 805 report with the "relevant agency" within 15 days after the facility's "peer review body" has taken any one or more of specified actions against a licensed health care professional, including the rejection, termination, or revocation of the licensee's staff privileges or membership "for a medical disciplinary cause or reason." (Bus. & Prof. Code, § 805, subd. (b), see *id*., subd. (f).) The agency must disclose to "an inquiring member of the public" a summary of "hospital disciplinary actions that result in the termination or revocation of a licensee's staff privileges for medical disciplinary cause or reason, unless a court finds, in a final judgment, that the peer review resulting in the disciplinary action was conducted in bad faith and the licensee notifies the [agency] of that finding." (*Id.*, § 803.1, subd. (b)(6).)

8

complaint included common law claims for interference with the right to practice an occupation (third count), intentional interference with contractual relations (fourth count), interference with prospective advantage (fifth count), and wrongful termination of hospital privileges (seventh count).

Defendants demurred, and also filed a motion under Code of Civil Procedure section 425.16, the so-called anti-SLAPP statute, to strike the complaint.[3] The anti-SLAPP motion asserted that (1) plaintiff's causes of action arose from defendants' "protected activity" within the meaning of the anti-SLAPP statute and (2) the suit lacked probable merit because, when plaintiff timely failed to seek direct judicial review of the decision by a petition for mandamus, that decision became final, and plaintiff could not thereafter attack it collaterally in this action.

The trial court overruled the demurrer and denied the anti-SLAPP motion. The court found that plaintiff's suit did not arise from defendants' protected activity, as described in Code of Civil Procedure section 425.16, because "disciplinary action is not protected activity." Moreover, the court determined,

---

[3] Code of Civil Procedure section 425.16 provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public participation) — litigation of a harassing nature, brought to challenge the exercise of protected free speech rights. The section is thus informally labeled the anti-SLAPP statute, and a motion to dismiss filed under its authority is denominated an anti-SLAPP motion. (See, e.g., *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 196-197 (*Kibler*).) We employ these terms as appropriate hereafter. Where the proponent of an anti-SLAPP motion, i.e., a defendant in a lawsuit, establishes that the suit arises from an act in furtherance of his or her rights of petition or free speech, the motion must be granted unless the plaintiff establishes a probability of prevailing on the merits of the action. (Code Civ. Proc., § 425.16, subd. (b); *Kibler*, *supra*, at p. 198; but see Code Civ. Proc., § 425.17 [placing certain limits on right to anti-SLAPP dismissal].)

plaintiff had established probable merit to his suit, because he was not required to exhaust direct judicial review of the Board's decision, by seeking and obtaining a writ of mandamus to set it aside, before filing the instant action.

The Court of Appeal affirmed in part and reversed in part. The appellate court first concluded the trial court had erred in finding the Hospital's peer review action was not protected activity for purposes of the anti-SLAPP provision. For this conclusion, the Court of Appeal cited *Kibler*, where we held that a medical peer review proceeding contemplated by Business and Professions Code section 809 et seq. is an "official proceeding authorized by law" within the meaning of the anti-SLAPP statute. (Code Civ. Proc., § 425.16, subd. (e).) Accordingly, *Kibler* concluded, defendants in suits arising from oral or written statements made in connection with issues under consideration or review in such a proceeding are entitled to anti-SLAPP protections. (*Kibler*, *supra*, 39 Cal.4th 192, 198-203; see Code Civ. Proc., § 425.16, subd. (e)(2).)

However, the Court of Appeal agreed in part with the trial court's "merits" determination. The appellate court concluded that the first count of plaintiff's complaint, for relief under section 1278.5, does not lack probable merit despite his prior failure to exhaust judicial remedies by way of a mandamus proceeding to set aside the Board's decision. In this regard, the Court of Appeal disagreed with any contrary implication in *Nesson*, *supra*, 204 Cal.App.4th 65. Furthermore, the appellate court determined, the complaint's second count, for a declaration under Business and Professions Code section 803.1, subdivision (b)(6), that the defendants acted in bad faith in terminating his Hospital privileges — a prerequisite to precluding the Medical Board of California from disclosing the termination to an "inquiring member of the public" — is functionally ancillary to the statutory whistleblower claim, and may thus also be maintained without prior exhaustion of judicial remedies.

10

On the other hand, the Court of Appeal held, the third, fifth, sixth, and seventh Counts of the complaint set forth statutory or common law claims to which the *Westlake* rule of prior judicial exhaustion applies. The Court of Appeal thus entered an order directing the trial court to grant the anti-SLAPP motion with respect to the third, fifth, sixth, and seventh counts, but to deny it with respect to the first, second, and fourth counts.[4]

We granted defendants' petition for review, and limited the issue to that raised in the petition, i.e., whether, before a physician may commence a civil suit alleging that a hospital's quasi-judicial decision to terminate the physician's staff privileges was wrongfully retaliatory under section 1278.5, the physician must first prevail in an administrative mandamus proceeding to set the decision aside. Answering that narrow question, we conclude that a successful mandamus attack on the decision is not a necessary condition to the filing of a section 1278.5 action. Accordingly, we will affirm the Court of Appeal's judgment.

---

[4]    The Court of Appeal noted that "[w]hile defendants' opening brief states that defendants seek reversal of the anti-SLAPP order 'in its entirety,' in their summary of the proceedings in the lower court, defendants concede that [count four of the complaint, a claim for intentional interference with contractual relations] is 'not subject to the anti-SLAPP motion and this subsequent appeal.' "

11

## DISCUSSION[5]

### A. Section 1278.5.

Section 1278.5, the health care facility whistleblower statute, was adopted in 1999 and amended in 2007. As currently in effect, it declares "the public policy of the State of California to encourage patients, nurses, *members of the medical staff*, and other health care workers to notify government entities of suspected unsafe patient care and conditions." (*Id.*, subd. (a), italics added.) To this end, the statute provides that "[n]o health care facility shall discriminate or retaliate, *in any manner*, against any patient, employee, *member of the medical staff*, or any other health care worker . . . because that person has . . . [¶] . . . [p]resented a grievance, complaint, or report *to the facility*, to an entity or agency responsible for accrediting or evaluating the facility, *or the medical staff of the facility*, or to any other governmental entity." (*Id.*, subd. (b)(1)(A), italics added.)[6] As applicable to

---

[5] Amicus curiae briefs on behalf of defendants have been filed by (1) Beta Healthcare Group; (2) the California Hospital Association; (3) Dignity Health and Adventist Health System/West; (4) Kaiser Foundation Hospitals; (5) a group including (a) Good Samaritan Hospital, L.P., (b) Los Robles Regional Medical Center, (c) San Jose Healthcare System, LP, (d) Riverside Healthcare System, L.P., (e) West Hills Hospital, and (f) Fountain Valley Regional Hospital & Medical Center; and (6) a group including (a) Scripps Health, (b) Sharp Healthcare, and (c) St. Joseph Health. The California Medical Association and the American Medical Association have jointly filed an amicus curiae brief on behalf of plaintiff.

[6] Section 1278.5 does not explicitly limit the type of "grievance, complaint, or report" for which retaliation is prohibited to one involving concerns about the quality of patient care. However, such a limitation is implicit in other provisions of the statute. In its declaration of policy, the statute sets forth the Legislature's finding that "whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations." (§ 1278.5, subd. (a).) Moreover, in extending whistleblower protection to those health care workers who cooperate or participate in certain governmental

*(Footnote continued on next page.)*

12

a member of the medical staff, "discriminatory treatment" includes "any unfavorable changes in . . . the . . . privileges of [such] member . . . ." (*Id.*, subd. (d)(2).)

Besides providing for a civil penalty of up to $25,000 for each violation (§ 1278.5, subd. (b)(3)), the statute specifies, inter alia, that "[a] member of the medical staff who has been discriminated against pursuant to this section shall be entitled to reinstatement, reimbursement for lost income resulting from any change in the terms or conditions of his or her privileges caused by the acts of the facility, . . . and the legal costs associated with pursuing the case, or to any remedy deemed warranted by the court pursuant to this chapter or any other applicable provision of statutory or common law" (*id.*, subd. g)). After a member of the medical staff "has filed an action pursuant to this section," civil discovery in the case may be delayed upon a petition by the facility's peer review committee demonstrating that such discovery will impede a pending peer review proceeding. (*Id.*, subd. (h).)

## B. Case law background.

In *Westlake*, *supra*, 17 Cal.3d 465, after a hospital revoked a physician's staff privileges, she sued the hospital and numerous individual members of its boards and committees. In her complaint, she asserted that she was a highly competent and qualified doctor, and that the revocation was the result of a malicious conspiracy to destroy her medical practice and restrain competition. The complaint set forth common law causes of action for unlawful intentional

---

*(Footnote continued from previous page.)*

investigations or proceedings, the statute makes clear that such investigations and proceedings are those "related to . . . the quality of care, services, or conditions at the facility." (*Id.*, subd. (b)(1)(B).)

13

interference with the right to practice a trade or calling; conspiracy to restrain competition; intentional infliction of emotional distress; and fraud and deceit. Compensatory and exemplary damages were sought.

Defendants moved for summary judgment, alleging that, in making its decision, the hospital had followed its established quasi-judicial procedures for determining staff privilege issues; that these procedures included a review committee hearing at which live and documentary evidence was presented; that the plaintiff was advised of, and exercised, all her internal rights to review; and that the decision had been upheld on review by the hospital's board of directors. The defendants claimed, among other things, that these facts barred plaintiff's action because she could not attack the hospital's quasi-judicial decision "collateral[ly]" by a tort suit for damages, but must first mount a successful "direct attack" on the decision by means of a mandamus action to set it aside. (*Westlake*, *supra*, 17 Cal.3d 465, 473.)

Applying the law generally applicable to cases of exclusion from professional associations, we agreed with defendants that, before suing for damages arising from expulsion or exclusion from a hospital's medical staff, a physician must exhaust all administrative *and judicial* avenues of review of the exclusionary decision. Thus, we reasoned, where the hospital afforded the physician quasi-judicial procedures before reaching its decision, he or she cannot sue in tort on grounds the decision was maliciously motivated without first having attacked it successfully by means of an administrative mandamus action. (*Westlake*, *supra*, 17 Cal.3d 465, 476-478.)

We analogized to the rule that, before bringing a malicious prosecution action, the plaintiff must have prevailed — i.e., achieved a "favorable termination" — in the prior suit he or she alleges was filed and pursued with wrongful motives. (*Westlake*, *supra*, 17 Cal.3d 465, 483.)  In both instances, we

14

reasoned, a claim that a judicial or quasi-judicial proceeding was misused for malicious purposes necessarily rests on the premise that the decision reached in that proceeding was erroneous and unjustified. Accordingly, we concluded, a failure to set aside a hospital's quasi-judicial decision by appropriate means of review has the effect of establishing its propriety. This principle, we said, accords proper respect for the result reached under the hospital's quasi-judicial procedures, prevents circumvention of normal avenues of review, and provides a justified measure of tort liability protection for those individuals "who take on, often without remuneration, the difficult, time-consuming, and socially necessary task of policing medical personnel." (*Westlake*, *supra*, 17 Cal.3d 465, 484.)[7]

*Westlake* thus established the principle that, before one may bring a common law tort suit claiming purely personal professional injury or damage arising from an allegedly malicious and wrongful quasi-judicial administrative decision, he or she must first demonstrate that the decision cannot survive the normal means of judicial review. The question before us is whether a different rule applies to a statutory cause of action for whistleblower retaliation under section 1278.5.

Of course, statutes generally should not be construed to alter or abrogate the common law. We have said that a legislative purpose to do so must clearly and unequivocally appear. (See, e.g., *Aryeh v. Canon Business Solutions, Inc.*

---

[7] As *Westlake* noted, an individual member of a hospital's medical staff peer review committee has a qualified state law immunity against personal liability for monetary damages for any act or proceeding undertaken within the scope of the committee's function to review the quality of care rendered by members of the hospital medical staff. The immunity applies if the committee member acted without malice, made a reasonable effort to ascertain the relevant facts, and reasonably believed his or her actions were warranted by the facts he or she knew after exerting such reasonable effort. (Civ. Code, § 43.7, subd. (b).)

(2013) 55 Cal.4th 1185, 1193; *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297.)  Accordingly, our post-*Westlake* cases addressing an individual's statutory right to sue for whistleblower retaliation — and thereby to vindicate the Legislature's purpose to encourage whistleblowing in the public interest — have examined the relevant laws carefully to determine if the Legislature intended, " 'either by express declaration or by necessary implication' " (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 329 (*Campbell*)), to abrogate the traditional requirements of prior administrative and judicial exhaustion.

Applying this principle, we have on several occasions found a clear legislative intent, whether express or implicit, to permit a statutory whistleblower action without prior exhaustion of administrative and judicial remedies.  We have done so even where the quasi-judicial administrative procedure at issue was not, as here, an alleged instrument of retaliation, but was instead itself a forum specifically provided to address claims of retaliation accomplished by other means.

*Campbell*, the first case in this series, was concerned only with whether particular whistleblower statutes required an employee claiming forbidden retaliation to exhaust the employer's internal *administrative* grievance procedures before filing a tort suit.  The plaintiff, an architect employed by the Regents of the University of California (Regents), sued the Regents, alleging she was demoted, then terminated, for reporting to superiors, and later to the Federal Bureau of Investigation, that the overly restrictive specifications the Regents were using for small campus construction projects violated competitive bidding laws.  Before commencing her whistleblower suit, she had filed an informal grievance with the Regents, but then ignored their advisement that the complaint must be resubmitted under the particular internal procedures applicable to whistleblower claims.

16

Then, as now, the California Whistleblower Protection Act (Gov. Code, § 8547 et seq. (Whistleblower Act)) generally forbade retaliation against an employee of a state agency, including the University of California (UC), for disclosing information that may evidence improper government activity, if the purpose of the disclosure was to remedy the improper situation. (*Id.*, §§ 8547.2, subd. (a), 8547.10, subds. (b), (c) (section 8547.10(b), section 8547.10(c).) As applicable to UC in particular, the statute provided, under the version of section 8547.10(c) then in effect, that the wronged whistleblower could bring a damage action, but only after the employee "[had] first filed a complaint with the university . . . , and the university [had] failed to reach a decision regarding that complaint within the time limits established for that purpose by the [R]egents."

In an apparent effort to avoid section 8547.10(c)'s explicit condition that an administrative complaint be filed, the plaintiff asserted her court claim under two other statutory whistleblower protection schemes, Government Code section 12653, subdivisions (b) and (c) (False Claims Act provision specifying that government employee discharged for disclosing false claim to law enforcement agency may bring damage action), and Labor Code sections 1102.5 and 1105 (forbidding employer, including UC, to retaliate against employee for disclosing to a government or law enforcement agency information about violations of law or failure to comply with regulations; further providing that "[n]othing in this chapter" shall prevent an employee's suit for damages). Among other things, the plaintiff urged that by comparing the express administrative complaint requirement in Government Code section 8547.10(c) with the "silence" on this subject in Government Code section 12653, subdivision (c) and Labor Code section 1105, we must conclude the latter statutes included no such requirement.

We disagreed. We noted that the specific exhaustion provisions in Government Code section 8547.10(c) — which primarily address how long a

17

pending administrative proceeding can *delay* the right to file a civil whistleblower complaint against the Regents — did not imply an intent to omit the traditional requirement of administrative exhaustion from any statutory whistleblower scheme where exhaustion was not expressly mentioned. (*Campbell*, *supra*, 35 Cal.4th 311, 327.) We further invoked the principle that where statutes, such as Government Code section 12653 and Labor Code sections 1102.5 and 1105, or their equivalents, create a right that did not previously exist at common law, and also provide a comprehensive system of administrative enforcement (there, through UC's detailed official grievance procedures), we must infer a requirement that the employee seek administrative relief before filing suit.

Finally, we rejected the plaintiff's argument that when it extended the Labor Code's whistleblower protections to public employees, including employees of UC, in 1992, the Legislature intended to abrogate any need to invoke the public employer's administrative grievance procedures before filing suit. We noted that, while initial legislative analyses of the 1992 bill indicated it would give public employees (like the private employees previously covered) a direct right to sue, later reports suggested a purpose merely to eliminate any prior requirement that a public employee prove malice in order to prevail on an administrative claim of whistleblower retaliation. Deeming the legislative history thus "unclear" (*Campbell*, *supra*, 35 Cal.4th 311, 331), we concluded we could not read into the statutory scheme an intent to override the normal rules of resort to administrative procedures.

More pertinent to the issue of *judicial* exhaustion, as presented by the instant case, is our decision in *Arbuckle*, *supra*, 45 Cal.4th 963. There, Arbuckle, an employee of the State Board of Chiropractic Examiners (SBCE) alleged she was subjected to workplace retaliation after she asked superiors whether she should issue a citation to the SBCE's chairperson for practicing with an expired

18

license, and was told not to do so. Arbuckle filed a complaint with the State Personnel Board (SPB), alleging retaliation in violation of the Whistleblower Act. After a detailed investigation pursuant to SPB regulations, during which each side submitted extensive documentary evidence and written arguments, the SPB's executive officer issued a 16-page "Notice of Findings" recommending dismissal of the complaint. The SPB's regulations allowed a complainant who received adverse findings from the executive officer to petition for a hearing before the board, but provided that if no timely petition was filed, the executive officer's recommendation would become the SPB's "final decision."

Arbuckle did not seek board review. Instead, she filed a superior court damage suit against the SBCE and its executive director, alleging whistleblower retaliation in violation of Government Code section 8547.8[8] and Labor Code section 1102.5. The defendants moved for summary judgment on these claims, asserting Arbuckle's failure to exhaust administrative and judicial remedies. The trial court denied the motion, but the Court of Appeal reversed.

On review, we reversed the Court of Appeal. We first concluded that Arbuckle had satisfied the administrative prerequisites to suit expressly set forth in Government Code section 8547.8, subdivision (c) (section 8547.8(c)). This statute, we noted, specified that a public employee could not pursue a civil damage action for whistleblower retaliation " 'unless [the employee] has first filed a complaint with the [SPB] . . . , and the Board has issued, or failed to issue, findings pursuant to [Government Code] [s]ection 19683.' " (*Arbuckle*, *supra*, 145 Cal.4th 963, 971, quoting § 8547.8(c), italics omitted.) In turn, we explained,

---

[8]    Government Code section 8547.8, part of the Whistleblower Act, applies to employees of state agencies other than the UC and California State University (CSU) systems. (See *id.*, § 8547.2, subds. (a), (f).)

19

Government Code section 19683, governing SPB procedures for handling complaints of reprisal or retaliation, clearly used the word "findings" to mean the initial decision of the SPB's executive officer, and did not encompass a requirement that a complainant who received adverse "findings" at this level seek a hearing before the board. Hence, we concluded, no such requirement was incorporated in section 8547.8(c).

We then turned to the defendants' claim that, before filing a statutory tort suit for whistleblower retaliation, Arbuckle was also required to exhaust judicial remedies against the SPB's adverse decision by prevailing in a mandamus action to have that decision set aside. (*Arbuckle*, *supra*, 45 Cal.4th 963, 974.) Generally, we conceded, writ review of an adverse administrative decision is a necessary step before further remedies are pursued, and if the administrative proceeding had the requisite judicial character, it is binding in a later court action. (*Id*. at pp. 975-976.) However, we noted, the Whistleblower Act expressly provided a civil action for whistleblower retaliation, while also specifying, as the only precondition to suit, that a complaint be filed with the SPB, and that the board "issue[ ], or fail[ ] to issue, findings." (§ 8547.8(c).) This statutory language, we concluded, suggested the Legislature did not intend the SPB decision to have preclusive effect against a complaining employee.

Moreover, we stressed, a conclusion that, unless overturned on mandamus, the SPB's findings are binding in a court action for damages under the Whistleblower Act would unduly restrict the statutory remedy. As we explained, "Writ review [of a quasi-judicial administrative proceeding] under Code of Civil Procedure section 1094.5 is limited to the record compiled by the administrative agency, and the agency's findings of fact must be upheld if supported by 'substantial evidence.' [Citation.]" (*Arbuckle*, *supra*, 45 Cal.4th 963, 977.) Under that standard of review, we noted, "it would be very difficult for a

20

complaining employee to have the board's adverse factual findings overturned. Therefore, in nearly every case, an adverse decision from the board would leave the employee without the benefit of the statutory remedy set forth in section 8547.8(c). . . . Nothing in section 8547.8(c) suggests that the Legislature intended the damages remedy created in that provision to be so narrowly circumscribed, and such a narrow interpretation of the damages remedy would hardly serve the Legislature's purpose of protecting the right of state employees 'to report waste, fraud, abuse of authority, violation of law, or threat to public health without fear of retribution.' [Citation.]" (*Arbuckle*, *supra*, at pp. 977-978.)

We later reached similar results, for similar reasons, when construing a portion of the Whistleblower Act that applies specifically to employees of the CSU system. In *Runyon, supra*, 48 Cal.4th 760, the plaintiff, Runyon, who had chaired an academic department of the College of Business Administration (College) at CSU Long Beach, filed an administrative whistleblower complaint with CSU. Runyon alleged he had been removed from his position by the College's dean, Luis Calingo, in retaliation for reporting improper conduct by Calingo. Pursuant to CSU's established procedures for handling such complaints, a CSU human resources manager conducted an internal investigation, during which Runyon had the opportunity to respond in writing to the investigator's tentative findings. Ultimately, CSU's vice-chancellor for human resources issued a determination letter stating CSU's decision that, while Runyon had made a protected disclosure by complaining about Calingo's habitual absence from campus, Calingo had not removed Runyon as department chair for that reason, but for inadequate job performance.

Runyon then filed a damage action against CSU and Calingo, asserting a cause of action under Government Code section 8547.12, which states when an employee may sue CSU for whistleblower retaliation. Under section 8547.12,

21

subdivision (c) (section 8547.12(c)), such an action is allowed only if the complaining employee has filed an administrative complaint, and CSU "has failed to reach a decision" thereon within the time set by its internal procedures, or has not "satisfactorily addressed" the claim within 18 months.

The trial court granted the defendants' motion for summary judgment. The court reasoned, first, that CSU had foreclosed a damage suit under section 8547.12(c) simply by rendering a timely, and thus "satisfactor[y]," decision on Runyon's administrative complaint, and second, that Runyon had failed to exhaust judicial remedies by successfully challenging CSU's action in a mandamus proceeding. The Court of Appeal affirmed. It rejected Runyon's argument that section 8547.12(c) protects CSU against a damage action only if CSU has addressed a whistleblower claim to the *employee's* "satisfact[ion]." Instead, the CA held, section 8547.12(c) precludes a damage suit so long as CSU has rendered its decision — even one adverse to the employee — after conducting a thorough, good-faith investigation in the spirit of the Whistleblower Act. The Court of Appeal also determined that, before filing a damage action, Runyon must establish, through a mandate proceeding, CSU's failure to meet these standards.

We reversed. We first concluded that by foreclosing a damage suit when CSU has "*satisfactorily* addressed" the employee's administrative complaint (italics added), section 8547.12(c) meant to impose such a bar only when CSU's administrative response was to the satisfaction of the complaining employee, not when CSU had rejected the employee's complaint. This construction, we explained, was consistent with both the language and the legislative history of section 8547.12(c). (*Runyon*, *supra*, 48 Cal.4th 760, 773.)[9]

---

[9]     Our *Runyon* opinion compared its construction of section 8547.12(c) with our then-recent interpretations of similar, but materially distinct, provisions of the

*(Footnote continued on next page.)*

22

We also concluded that section 8547.12(c) does not require a CSU employee to exhaust judicial remedies by mounting a successful mandamus challenge against CSU's adverse administrative decision before filing a civil action under the Whistleblower Act. As in *Arbuckle*, we explained that the

---

*(Footnote continued from previous page.)*

Whistleblower Act applicable to other state entities. In *Miklosy*, *supra*, 44 Cal.4th 876, we noted, we had addressed section 8547.10 (c), specifically applicable to the UC system. As then in effect, section 8547.10(c) provided that a UC employee who claimed whistleblower retaliation could sue only if he or she had filed an administrative complaint with the university, and UC "[had] failed to reach a decision regarding that complaint within the time limits established for that purpose by the [R]egents." (Stats. 1999, ch. 673, § 7, p. 5000.) Section 8547.10(c), unlike section 8547.12(c), did not then contain a further proviso that a suit was allowed if UC had not "satisfactorily addressed" the complaint within a specified time. In *Miklosy*, *supra*, 44 Cal.4th 876, we found that the plain language of section 8547.10(c) barred a whistleblower damage action against UC if the university had reached *any* decision on an employee's administrative complaint, whether favorable or adverse to the employee, within the time limits established by the university. Our *Miklosy* opinion noted the absence from section 8547.10(c) of the "satisfactorily addressed" language included in section 8547.12(c), and expressly left open whether the presence of such language in section 8547.10(c) would have altered our interpretation of that statute. (*Miklosy*, *supra*, 44 Cal.4th at pp. 887-890.) In the wake of *Miklosy*, the Legislature amended section 8547.10(c) to add "satisfactorily addressed" language. (§ 8547.10(c), as amended by Stats. 2010, ch. 104, § 1.)

Our *Runyon* decision also took note of a "third textual variation"(*Runyon*, *supra*, 48 Cal.4th 760, 766) in administrative exhaustion language included in the Whistleblower Act, language we had confronted in *Arbuckle*, *supra*, 45 Cal.4th 963. As explained above, *Arbuckle* was concerned with section 8547.8(c), which requires an employee of a state agency, such as the SBCE, to file a whistleblower complaint with the SPB before bringing a civil action, but then allows such a suit if the SPB has thereafter "issued, or failed to issue, findings." We concluded in *Arbuckle* that this language does not require the employee to seek administrative or judicial review of the SPB's initial adverse "findings" before filing suit. (See text discussion*, ante*.)

23

general rule giving preclusive effect to a final quasi-judicial administrative decision in a later civil proceeding does not apply if it would contravene the Legislature's intent in establishing the proceeding in which such preclusive effect is urged. We noted that, by its terms, section 8547.12(c) authorizes a damage action once the employee claiming whistleblower retaliation has filed an internal complaint, and CSU has failed to "satisfactorily address" that complaint — i.e., to resolve it to the employee's satisfaction — within the requisite times. We explained that, like section 8547.10(c), the similar provision at issue in *Arbuckle*, section 8547.12(c), expressly recognizes the parallel administrative remedy, yet does not require that the administrative findings be set aside by mandate before a civil damage action is permitted. "As in *Arbuckle*, then, to hold an adverse administrative finding preclusive in the expressly authorized damages action would be contrary to the evident legislative intent." (*Runyon*, *supra*, 48 Cal.4th 760, 774.)

Moreover, we stressed that, as in *Arbuckle*, according preclusive effect to the administrative decision would unduly restrict the civil remedy provided by the pertinent whistleblower statute. We iterated that "[w]rit review, whether through administrative mandate (Code Civ. Proc., § 1094.5) or ordinary mandate (*id.*, § 1085), gives substantial deference to the agency's findings. Requiring the employee to overturn CSU's adverse decision by writ before bringing a civil action would mean that 'in nearly every case, an adverse decision from [CSU] would leave the employee without the benefit of the damages remedy set forth in [section 8547.12(c)].' [Citation.]" (*Runyon*, *supra*, 48 Cal.4th 760, 774.) Quoting *Arbuckle*, we explained again that nothing in the Whistleblower Act suggests the Legislature intended to so narrowly circumscribe a statutory damage remedy designed to encourage public employees to report threats to health or safety, or the wrongful or incompetent performance of public duty. (*Ibid.*)

24

## C. Does section 1278.5 require judicial exhaustion?

On the issue of exhaustion of judicial remedies, we reach a similar conclusion with respect to the instant plaintiff's complaint for whistleblower retaliation under section 1278.5. As indicated above, this statute prohibits a health care facility from "discriminat[ing] or retaliat[ing], in any manner" against a patient, employee, or member of the medical staff "because" that person has presented to the facility a grievance, complaint, or report related to patient care of safety. (*Id.*, subd. (b)(1)(A).) In this regard, discriminatory treatment of a medical staff member includes any unfavorable change in the member's staff privileges. (*Id.*, subd. (d)(2).) If such a discriminatory act, known to hospital officials, occurs within 120 days after the medical staff member has reported a grievance or complaint related to patient health, care, or safety, there is a "rebuttable presumption" that the act was done in retaliation for the complaint. (*Id.*, subd. (d)(1).)

A medical staff member who has suffered retaliatory discrimination "shall be entitled" to redress, including, as appropriate, reinstatement and reimbursement of resulting lost income. (§ 1278.5, subd. (g).) Section 1278.5 does not affirmatively state that these remedies may be pursued by means of a civil action, but it necessarily assumes as much when it explains certain procedures that may apply when "the member of the medical staff . . . has filed *an action pursuant to this section*." (*Id.*, subd. (h), italics added.)

We note, at the outset, a distinction between the whistleblower provisions addressed in *Arbuckle* and *Runyon*, on the one hand, and section 1278.5, on the other — a distinction that further weakens any inference of the need, under the latter statute, to overturn a quasi-judicial hospital disciplinary decision on mandamus before a statutory whistleblower action is permitted. Unlike the statutes at issue in *Arbuckle* and *Runyon*, section 1278.5 includes no express or

25

implied proviso that a protected individual who alleges retaliatory discrimination cannot sue on this claim unless he or she first presents it to an administrative body.

Indeed, in contrast with those laws, section 1278.5 neither provides, nor acknowledges the existence of, a parallel administrative proceeding in which the complainant's claim of retaliation, as such, might be addressed and resolved. Section 1278.5's failure to mention resort to such an administrative forum as a condition to suit, where the Legislature has included such a requirement in similar statutes, is a significant indicator that the Legislature did not contemplate such a precondition in this instance.

Indeed, the Hospital's peer review proceeding was not an administrative forum designed to consider, and to redress by appropriate relief, plaintiff's claim of discriminatory treatment in retaliation for his reports about substandard patient care by others. On the contrary, the ostensible purpose of the proceeding was to address charges against him that deficiencies in his own competence and professionalism constituted a danger to patient care. The retaliatory termination of his privileges, he claims in essence, was accomplished by this pretextual means. Thus, the peer review proceeding was not a potential administrative remedy for the discrimination he allegedly suffered, but, according to his civil complaint, was itself the instrument of that discriminatory treatment.[10]

---

[10] It does appear that the charges addressed in the Hospital's peer review proceedings on the one hand, and plaintiff's claims of retaliation on the other, are factually related, in that they arise, at least in part, from the same disagreements between plaintiff and Hospital nurses. The gravamen of the disciplinary charges was that, on numerous occasions, plaintiff was belligerent and abusive to members of the Hospital's staff, displaying anger management problems that seriously disrupted the Hospital's routine, created a hostile work environment, and interfered with his own clinical judgment, thus adversely affecting patient care. For purposes of section 1278.5, on the other hand, plaintiff claims the real motive for the Hospital's effort to get rid of him was not his allegedly disruptive behavior

*(Footnote continued on next page.)*

26

Reasons cited in *Arbuckle* and *Runyon* for concluding that judicial

exhaustion was contrary to the legislative intent and purpose thus apply with even

_____

*(Footnote continued from previous page.)*

toward coworkers that endangered patients, but his very acts of calling the Hospital's attention to those coworkers' deficiencies in the interest of patient health and safety. However, this alleged motive was not at issue, as such, in the peer review proceedings. At the JRC hearing, the instructions given by the presiding hearing officer, and the arguments of both parties, focused solely on whether the MEC's recommendation that plaintiff's Hospital staff privileges not be renewed was "reasonable and warranted," in that the evidence disclosed an "aspect of [plaintiff's] competence or professional conduct that [was] reasonably likely to be detrimental to patient[s'] safety or to the delivery of patient care." Though plaintiff apparently suggested during the JRC hearing that the Hospital administration acted unfairly in presenting one-sided information to the MEC, his counsel asserted in argument that "we're not asking for a specific finding of bad faith or improper motive by the hospital administration. The hospital administration's conduct explains how we got here, but it's not something you need to decide in terms of your issue of the removal of [plaintiff's] privileges."

Yet, as the parties' conflicting claims in this case suggest, a hospital's concerns about a medical staff member's ability to provide adequate patient care — even if those concerns are reasonable and sincere — do not negate the possibility that retaliatory animus against a whistleblower, a motive forbidden by statute, was a contributing influence on the hospital's quasi-judicial peer review decision to terminate or limit the member's staff privileges. These are distinct issues, even if they happen to coalesce in a particular case, and the Legislature has provided distinct fora and procedures to address each of them. We see no indication that, in doing so, the Legislature intended to limit the statutory right to sue for whistleblower retaliation to only those physicians who have shown on mandamus that there was no reasonable quality-of-care basis for the actions taken against them. We do not speculate whether such "mixed motives" were at work in this case. Moreover, as we discuss in greater detail below, we express no views on how the timing, issues, and remedies involved in a physician's whistleblower retaliation suit under section 1278.5 might be affected by a final, unreviewed quasi-judicial peer review decision finding quality-of-care grounds to limit or terminate the physician's hospital staff privileges. These difficult questions are beyond the scope of the narrow issue on which we granted review. They must await future development, and we thus do not address them.

greater force here. In those cases, we emphasized that judicial exhaustion requirements would seriously undermine the protective statutory purposes of the Whistleblower Act even though the administrative procedures at issue were designed to address and resolve the very claims of retaliation later asserted in civil lawsuits. Here, by contrast, the administrative proceeding at issue was not a forum for redressing a claim of retaliation, but instead is alleged to be a means by which that retaliation occurred.

A requirement that plaintiff succeed in overturning an allegedly retaliatory, as opposed to remedial, administrative decision before filing a statutory action would very seriously compromise the legislative purpose to encourage and protect whistleblowers. On mandamus review, the Hospital's ruling in this case could not be set aside if, on the face of the administrative record, fair procedures produced a decision substantially supported by evidence and findings that plaintiff's professional shortcomings endangered patient care and thus warranted the termination of his staff privileges. (Code Civ. Proc., § 1094.5, subds. (b)-(d); see *Arbuckle*, *supra*, 45 Cal.4th 963, 977.)[11] The difficulty of overcoming this hurdle

---

[11]    In *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802 (*Anton I*), we held that, when reviewing a private hospital's quasi-judicial decision terminating a physician's staff privileges — a " 'fundamental vested right' " in the nature of " 'a property interest which directly relates to the pursuit of [the physician's] livelihood' " (*id.*, at p. 823) — the mandamus court must exercise its "independent judgment" on "the weight of the evidence" (*id.*, at p. 830). The Legislature then amended Code of Civil Procedure section 1094.5 to provide that such decisions are reviewable by the more deferential "substantial evidence" standard. (Code Civ. Proc., § 1094.5, subd. (d), as added by Stats. 1978, ch. 1348, § 1, p. 4476.) Subsequent decisions held that the 1978 amendment, adding subdivision (d) to Code of Civil Procedure section 1094.5, validly abrogated *Anton I*. (*Anton v. San Antonio Community Hospital* (1982) 132 Cal.App.3d 638, 653 (*Anton II*), accord, *Gaenslen v. Board of Directors* (1985) 185 Cal.App.3d 563, 574.)

would significantly impede plaintiff's opportunity, afforded to him without apparent qualification by section 1278.5, to prove by a preponderance of evidence, to a judicial fact finder, his or her distinct claim that there was a forbidden retaliatory motive for the decision. In some cases, it would flatly contradict the provision of section 1278.5, subdivision (d)(1) that, for purposes of a civil whistleblower suit, there is a "rebuttable presumption" of retaliatory motive if a discriminatory action is taken against a hospital physician, with the knowledge of the facility's responsible staff, within 120 days after he or she has submitted a protected grievance or complaint.

Defendants stress that in *Westlake*, *supra*, 17 Cal.3d 465, we invoked, by analogy, the law applicable to malicious prosecution suits to assert that a physician may not base a common law tort action on the allegation that a quasi-judicial medical peer review decision was wrongly motivated, unless the physician first succeeds in showing, by mandamus, that the decision was erroneous with respect to the issues actually adjudicated. We noted in particular that such a rule provided some justified measure of protection against unfair tort liability for those individuals who voluntarily undertake the difficult but socially important task of policing hospital medical standards.

But the balance of competing interests is altered when the wrongful motive at issue is one specifically prohibited by statute, in the public interest, under a legislative policy that also seeks to safeguard the health and safety of hospital patients. Section 1278.5 specifically contemplates that forbidden retaliatory action against a medical staff whistleblower includes "any unfavorable changes in . . . the terms or conditions of . . . privileges of the . . . member of the medical staff." (*Id.*, subd. (d)(2).) The statute further provides, without qualification, that a medical staff member who has suffered such retaliatory discrimination is entitled to relief for "any change in the terms or conditions of his or her privileges caused by the

29

[wrongful] acts of the [health care] facility" (*id.*, subd. (g)). Clearly aware that hospitals commonly "act[ ]" on medical staff privilege issues through quasi-judicial peer review proceedings (§ 1278.5, subd. (h); Bus. & Prof. Code, § 809 et seq.; see *Westlake*, *supra*, 17 Cal.3d 465), the Legislature has given no indication that it intends to require a medical staff whistleblower to have such an allegedly retaliatory "act[ ]" set aside in a separate court proceeding before he or she may bring a statutory action.[12]

Indeed, as the Court of Appeal noted, the Legislature expressly contemplated that a staff physician's action under section 1278.5 *might already have begun* while medical staff peer review proceedings against the plaintiff were also still pending. When section 1278.5 was amended in 2007 to extend whistleblower protection to hospital staff physicians (Stats. 2007, ch. 683, § 1, p. 5809), a new subdivision (h) was added "to protect a [hospital] peer review committee from . . . evidentiary demands on a pending peer review hearing from the member of the medical staff *who has filed an action pursuant to this section*." (Italics added.) Under this provision, a hospital's medical staff may petition the court for an injunction, pending completion of a peer review process, to protect the peer review committee from having to comply with such demands "from the complainant" if they "would impede the peer review process or endanger the

---

**12** Defendants suggest that, because the California Medical Association, the principal sponsor of the 2007 amendments adding hospital staff physicians to the list of persons protected by section 1278.5, did not expressly include quasi-judicial hospital peer review proceedings in its examples of the devices health care facilities use to retaliate against whistleblowing physicians, there was no legislative intent to encompass such proceedings as potentially retaliatory acts. The plain statutory language belies that contention; it provides that "[n]o health care facility shall discriminate or retaliate, *in any manner*, against any . . . member of the medical staff." (*Id.*, subd. (b)(1), italics added.)

30

health and safety of patients of the [hospital]." (*Ibid.*) Thus, by its terms, subdivision (h), as added by the 2007 amendments, envisions that hospital peer review proceedings against a physician, on the one hand, and the physician's section 1278.5 whistleblower action, on the other, might coexist simultaneously.

The legislative history of subdivision (h) is consistent with a conclusion that the Legislature did not intend to require postponement of a section 1278.5 action even while peer review proceedings against the plaintiff were still in progress, let alone until the final peer review decision had been set aside by mandamus. As introduced on February 21, 2007, Assembly Bill No. 632 (2007-2008 Reg. Sess.) (Assembly Bill No. 632) added hospital staff physicians to the list of protected persons under section 1278.5, but it did not include the provisions of subdivision (h).

The genesis of subdivision (h) is elucidated in a Senate Judiciary Committee analysis prepared for a July 10, 2007, committee hearing. The analysis reported that a major opponent of the proposed amendments, the California Hospital Association (CHA), was concerned that extension of whistleblower protection to hospital staff physicians would have a chilling effect on peer review proceedings, because "the bill could stop a peer review process in its tracks by the simple filing of a section 1278.5 action," or "could compel a peer review committee not to initiate a peer review process *for fear that it could be considered a retaliatory action . . . .*" (Sen. Judiciary Com., analysis of Assem. Bill No. 632 as amended June 6, 2007, p. 9, italics added.)

The analysis further declared that "[t]he critical question, according to the principal opponents of [Assembly Bill No.] 632, is what would happen to a pending peer review action, or to the evidentiary protections and immunity from liability that attend peer review actions, *once the member of the medical staff files a [section] 1278.5 action*? The hospital, CHA states, could very well be required

to produce evidence in the [section] 1278.5 action even *before* that evidence has been fully developed and presented in a [m]edical [s]taff fair hearing under [Business and Professions Code section] 809 et seq." (Sen. Judiciary Com., analysis of Assem. Bill No. 632, *supra*, p. 10, italics added.)

The Legislature responded to these concerns by a Senate amendment to the bill on July 17, 2007. (Sen. Amend. to Assem. Bill No. 632, July 17, 2007.) It did not do so by immunizing the final quasi-judicial decisions of peer review committees from section 1278.5 actions, or by requiring, as a condition to a civil suit under section 1278.5, that such a decision be set aside by mandamus, or even by providing that a section 1278.5 action should be postponed, or held in abeyance, pending such a final decision. Instead, it simply specified that if the staff physician did file such a suit, the committee could obtain, for the duration of its proceedings and no longer, an injunction against civil discovery demanded by the physician if such discovery would impede those proceedings. (Sen. Amend. to Assem. Bill No. 632, July 17, 2007.)

CHA was not satisfied with the July 17, 2007, amendment. In a "Senate Floor Alert" dated August 21, 2007, CHA advanced various objections to Assembly Bill No. 632, as then amended, and proposed further amendments. Among other things, CHA argued that the medical peer review process, with its requirements of administrative exhaustion subject to deferential review under Code of Civil Procedure section 1094.5, would be "significantly undermined if [as proposed subdivision (h) appeared to contemplate,] a member of the medical staff is able to move directly into court without completing the fair hearing process." (David van der Griff, CHA Legis. Advocate, CHA, Sen. Floor Alert re Assem. Bill No. 632 (Aug. 21, 2007) (CHA Senate Floor Alert), p. 2.)

Accordingly, CHA asserted, the bill should further guard against the "chilling effect" of section 1278.5 suits on hospital peer review activities by

32

replacing subdivision (h)'s provision for injunctive relief against civil discovery while peer review proceedings were still under way with a provision "that section 1278.5 *does not apply* to a proposed or taken investigation, corrective or disciplinary action by a medical staff or a hospital governing board against a member of a medical staff or an applicant *unless and until there has been a determination that the member or applicant has been determined to have substantially prevailed in such action as specified in current law*."  (CHA Sen. Floor Alert, *supra*, at p. 2, italics added.)[13]  A Senate analysis of Assembly Bill No. 632, as amended on July 17, 2007, reported generally that "CHA believes that this bill needs further clarification to ensure that hospitals retain the right to take disciplinary action with regard to disruptive behavior by employees, patients and physicians, regardless of [such individuals'] protected activity."  (Sen. Rules. Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill No. 632, as amended July 17, 2007, p. 7.)

The only discernible response to these arguments was the addition of subdivision (*l*) to section 1278.5 by a September 5, 2007, Senate amendment. (Sen. Amend. to Assem. Bill No. 632, Sept. 5, 2007.)  As so added, subdivision (*l*) provides simply that "[n]othing in this section shall be construed to limit the ability of the medical staff to carry out its *legitimate* peer review *activities* in accordance with [s]ections 809 to 809.5, inclusive, of the Business and Professions Code."  (§ 1278.5, proposed subd. (*l*) as amended in Sen., Sept. 5, 2007, italics added.)

---

[13]    Though the wording of this proposal is not entirely clear, it appears to suggest that a disciplined staff physician would not be able to sue under section 1278.5 without some form of prior review of the disciplinary decision to determine whether the physician had "substantially prevailed."

Still not satisfied, CHA submitted an "Assembly Floor Alert" dated September 10, 2007.  (David van der Griff, CHA Legis. Advocate, CHA, Assem. Floor Alert re Assem. Bill No. 632 (Sept. 10, 2007) (CHA Assembly Floor Alert).)  Again CHA proposed replacement of subdivision (h)'s "injunction against discovery" language with CHA's earlier suggestion that no section 1278.5 action should lie absent a prior "determination" that the plaintiff had "substantially prevailed" in peer review proceedings.  CHA insisted the current version of subdivision (h) was not good enough, because it "does not . . . address the real issue, which is allowing someone to get into court on a retaliation claim while a peer review action is either still in the investigatory stage[,] . . . or underway, . . . but the hearing/appeal is not yet completed and the [hospital's] governing body has not yet taken final action."  (CHA Assem. Floor Alert, *supra*, at p. 2.)  If a section 1278.5 suit were allowed under such conditions, CHA argued, the court would be "independently assessing the validity of the unfinished peer review action . . . in a circumstance where the burden of proof is on the hospital," rather than "pursuant to Code of Civil Procedure [section] 1094.5 . . . , where the standard of review is . . . 'substantial evidence' . . . ."  (CHA Assem. Floor Alert, *supra*, at p. 2.)

The Legislature was thus specifically aware of CHA's insistence that the bill should protect medical staff peer review proceedings by not allowing a whistleblower suit unless a hospital's final disciplinary decision failed to survive deferential mandamus review.  Nonetheless, the Legislature made no changes in response to the CHA Assembly Floor Alert.  Specifically, it left intact subdivision (h), in which, as noted above, the Legislature indicated its understanding that a civil action under section 1278.5 might be commenced, and civil discovery attempted, while peer review proceedings were still under way.  The legislative history thus supports the clear implications of the statutory language, i.e., that the

34

Legislature did not intend to require a hospital staff physician who claims a peer review committee's final disciplinary decision was an act in retaliation for whistleblowing activity to succeed in setting the decision aside by mandamus before bringing an action under section 1278.5.[14]

Defendants and their amici curiae stress that since 1989, California statutes have specifically mandated a detailed system of hospital medical peer review with quasi-judicial requirements of fair procedure — a system intended both to protect hospitals and their patients against medical staff incompetence and to assure that competent doctors are not arbitrarily denied staff privileges. (Bus. & Prof. Code, § 809 et seq.; see, e.g., *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267; *Kibler*, *supra*, 39 Cal.4th 192, 199.) By so providing, defendants insist, the Legislature clearly intended to retain the common law *Westlake* rule, actually codified that rule, and thus rendered the final decisions reached in quasi-judicial hospital peer review proceedings proof against all challenges — including claims of wrongful motive — unless those decisions fail to survive mandamus review. It is suggested that patient care and safety would be

---

[14] Defendants note that, when recommending concurrence in the Senate's September 5, 2007, addition of subdivision (*l*), a final Assembly bill analysis stated the intent of this amendment, as described by the Senate Judiciary Committee, was "to ensure that the health facility peer review committee continues to operate *as it has under current law*." (Assem. Conc. in Sen. Amend. to Assem. Bill No. 632, as amended Sept. 5, 2007, p. 3, italics added.) But this description is entirely consistent with subdivision (*l*)'s assertion that section 1278.5 should not be construed to limit a hospital medical staff's "ability" to carry out its "legitimate" peer review "activities." Nothing in either subdivision (*l*), or in the legislative remark defendants cite, suggests an intent — contrary to the understanding implicitly set forth in subdivision (h) — to require a disciplined staff physician to mount a successful mandamus challenge to the final peer review decision before filing a whistleblower suit under section 1278.5.

seriously undermined by allowing lay jurors to assess the validity of a medical peer review decision.

But nothing we see in either the Business and Professions Code scheme, or in section 1278.5 itself, expressly or implicitly impedes a legal claim, authorized by the explicit terms of section 1278.5, that a hospital physician's staff privileges were terminated in retaliation for his or her attempts to alert the hospital to patient care and safety problems. Sections 809 through 809.9 of the Business and Professions Code are silent on that subject. Business and Professions Code section 809.8 declares that nothing in the preceding provisions for medical peer review "shall affect the *availability* of judicial review under [s]ection 1094.5 of the Code of Civil Procedure." (Italics added.) However, the section does not state that such review is a precondition to filing a statutory action for whistleblower retaliation.

Similarly, the 2007 amendment to section 1278.5, which authorizes whistleblower suits by hospital staff physicians, contains no hint that the right to sue is procedurally limited when a forbidden retaliatory action was taken through medical peer review proceedings. As indicated above, the Legislature knew that disciplinary actions against a hospital staff physician commonly do — indeed must — occur through the peer review process. Thus, the Legislature's failure to expressly provide that a medical peer review decision be overturned on mandamus before a physician could claim, under section 1278.5, that the decision constituted forbidden retaliation strongly suggests no such limitation on the statutory cause of action was intended.

We understand the need to implement both the statutory medical peer review process, and the whistleblower protections provided by section 1278.5, in a manner that serves the common aim of both schemes — the safe and competent care of hospital patients. We also realize that two things may be true at the same

36

time — first, that personal enmity, including a forbidden retaliatory motive, was involved, at least to some degree, in a peer review decision to restrict or terminate a physician's staff privileges, and second, that the peer review record nonetheless discloses substantial quality-of-care grounds for the decision.

Under such circumstances, future litigants may contend that several substantive factors, unrelated to the issue of mandamus exhaustion, do, or should, limit the remedies available for the retaliatory aspect of the decision. As we have explained, Civil Code section 43.7 immunizes the duly appointed members of a properly constituted medical peer review committee from monetary liability for nonmalicious, reasonably informed, and reasonably warranted disciplinary decisions against a hospital staff physician. As we discuss below, the federal Health Care Quality Improvement Act of 1986 (HCQIA; 42 U.S.C. § 11101 et seq.) appears to require an even broader state immunity from monetary liability for both individuals and health care facilities that participate in reasonably informed, reasonably justified disciplinary decisions by qualified medical peer review bodies.

Moreover, we recently held, under California's Fair Employment and Housing Act, that where an employer's decision to terminate an employee involved a combination of legitimate reasons and statutorily forbidden discrimination, but the employer proves it would have reached the same conclusion even absent the wrongful discriminatory motive, the terminated worker is not entitled to reinstatement, lost income, and noneconomic damages otherwise available under the statute. In such a case, the worker's remedies are limited to injunctive and declaratory relief, and legal fees and costs. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232-235.) It is possible to argue that similar limitations should apply, in an action under section 1278.5, when a physician shows that his or her medical whistleblowing activities helped fuel the hospital's

37

desire to restrict or terminate staff privileges, but the hospital then demonstrates that the peer review process would validly have produced the same result, on legitimate quality-of-care grounds, even absent the retaliatory animus.

It may also be urged that efficiency, and proper deference to the peer review process, justify delaying a trial of a civil action under section 1278.5 until peer review proceedings involving the same hospital staff physician are complete. In a related vein, questions may arise about the extent to which the findings made, and the issues determined, in a final, unreviewed quasi-judicial peer review proceeding should have preclusive effect in a section 1278.5 trial. We stress, however, that all these matters are beyond the scope of the narrow issue on which we granted review. We therefore pass no judgment on them, and await their development in future cases.

Finally, in an argument raised for the first time in this court, defendants urge that serious questions of federal preemption arise under HCQIA if section 1278.5 is construed to allow a staff physician to challenge a quasi-judicial hospital peer review decision in a whistleblower action for damages without first overturning the decision on mandamus. Amici curiae Dignity Health and Adventist Health System/West echo that argument, and suggest further that HCQIA was intended to entirely preclude state laws granting whistleblower protection to hospital staff physicians.

HCQIA seeks to address the "nationwide problems" of the "increasing occurrence of medical malpractice," and of "the need to improve the quality of medical care," through "greater efforts than those that can be undertaken by any individual State." (42 U.S.C. § 11101(1)). The statute's focus is "effective professional peer review." (*Id.*, § 11101(3).) In this regard, Congress has found that the threat of private damages liability discourages physicians from participating in the peer review process (*id.*, § 11101(4)), and that "[t]here is an

38

overriding national need to provide incentive and protection for physicians engaging in effective professional peer review" (*id.*, § 11101(5)).

Accordingly, HCQIA provides, in pertinent part, that if a "professional review action" by a "professional review body"[15] meets statutory standards, participants in the professional review process "shall not be liable in damages under any law . . . of any [s]tate . . . with respect to the action." (42 U.S.C. § 11111(a)(1).) To qualify for this immunity, the professional review action "must be taken— [¶] (1) in the reasonable belief that the action was in the furtherance of quality health care, [¶] (2) after a reasonable effort to obtain the facts of the matter, [¶] (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and [¶] (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain [the] facts . . . ." (*Id.*, § 11112(a).)

A professional review action is presumed to have met these standards, subject to rebuttal by a preponderance of evidence. (42 U.S.C. § 11112(a).) Federal decisions generally have held that where the objective standards for HCQIA immunity are met, i.e., where the record establishes a sufficient quality-of-care basis for the peer review action, the disciplined physician cannot overcome the immunity by showing the peer reviewers acted in bad faith or with hostile motives. (E.g., *Poliner v. Texas Health Systems* (5th Cir. 2008) 537 F.3d 368,

---

[15] A "professional review body" includes a "health care entity . . . which conducts professional review activity," "the governing body or any committee of [the] entity which conducts [such] activity," and "any committee of the [entity's] medical staff . . . when assisting the governing body in a professional review activity." (42 U.S.C. § 11151(11).)

379-380, and cases cited; *Brader v. Allegheny General Hospital* (3d Cir. 1999) 167 F.3d 832, 840; *Austin v. McNamara* (9th Cir. 1992) 979 F.2d 728, 734.)[16]

The substantive effect of HCQIA on section 1278.5's whistleblower protection for hospital staff physicians was not raised below, was not included in defendants' petition for review, and is beyond the scope of the issue on which we granted review. Accordingly, we decline to address that question in detail. We note parenthetically that, at a minimum, HCQIA does not preclude such remedies as reinstatement and injunctive relief. Moreover, it allows the presumption of immunity to be rebutted by a preponderance of evidence that the peer review participant acted without adequate effort to ascertain the relevant facts, or had no reasonable ground to believe, based on the known facts, that the action was warranted on quality-of-care grounds. Thus, nothing in HCQIA's terms absolutely forecloses a state tort suit alleging that a peer review decision constituted improper retaliation against a whistleblower.[17]

Nor do we see any basis to conclude that HCQIA precludes a hospital physician from bringing a state law whistleblower suit claiming that a hospital peer review decision was retaliatory until the physician has first obtained

---

**16** As noted above, California provides a similar immunity from monetary liability to members of a medical peer review committee, acting within the scope of their quality care assurance duties, who make reasonable efforts to ascertain the relevant facts and reasonably believe their actions are warranted on quality-of-care grounds, but the California immunity is expressly limited to actions taken "without malice." (Civ. Code, § 43.7, subd. (b).)

**17** Plaintiff also urges that HCQIA immunity is superseded if a peer review decision, even one reasonably supported on quality-of-care grounds, involved a *criminal* purpose against the disciplined physician, such as the whistleblower retaliation made a misdemeanor by section 1278.5 As indicated above, we have no occasion to decide that issue, and we decline to do so.

mandamus relief against the decision.  HCQIA says or implies nothing about the *procedures* states may utilize to determine whether medical peer review decisions are subject to challenge.  Accordingly, we are satisfied that HCQIA does not call into question the interpretation of section 1278.5 we have reached above.[18]

---

[18]     As noted above, our conclusions are in apparent conflict with *Nesson*, *supra*, 204 Cal.App.4th 65.  There, a physician filed a suit challenging a hospital's suspension, after peer review, of his staff privileges, and the resulting termination of his contract to provide hospital radiology services.  Included in the complaint were both common law and statutory causes of action, including a claim under section 1278.5.  With no independent analysis, the Court of Appeal in *Nesson* applied *Westlake* to hold that the entire action, including the section 1278.5 claim, must fail because the plaintiff had not first exhausted internal hospital administrative remedies, then filed and prevailed in a mandamus proceeding to overturn the decision.  Additionally, *Nesson* held, the section 1278.5 cause of action could not succeed because the evidence showed that the suspension of the plaintiff's privileges was unrelated to the patient safety complaints he had made over eight months earlier.  As noted, the *Nesson* court gave no critical consideration to whether *Westlake* should govern under the specific provisions and policies of section 1278.5, and we find *Nesson*'s analysis of the judicial exhaustion issue unpersuasive in that regard.  To the extent *Nesson*, *supra*, 204 Cal.App.4th 65, contradicts our analysis in this case, we disapprove that decision.

41

## DISPOSITION

We conclude that a hospital staff physician who claims a hospital decision to restrict or terminate his staff privileges was an act in retaliation for his or her whistleblowing in furtherance of patient care and safety need not seek and obtain a mandamus petition to overturn the decision before filing a civil action under section 1278.5. Accordingly, we affirm the judgment of the Court of Appeal. To the extent *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 is inconsistent with our conclusion, that decision is disapproved.

BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Fahlen v. Sutter Central Valley Hospitals

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 208 Cal.App.4th 557
**Rehearing Granted**

_____

**Opinion No.** S205568
**Date Filed:** February 20, 2014

_____

**Court:** Superior
**County:** Stanislaus
**Judge:** Timothy W. Salter

_____

**Counsel:**

Hanson Bridgett, Joseph M. Quinn, Glenda M. Zarbock, Lori C. Ferguson; Arent Fox, Lowell C. Brown, Debra J. Albin-Riley and Jonathan E. Phillips for Defendants and Appellants.

Fulbright & Jaworski, Mark A. Kadzielski, Robert M. Dawson, Tambry L. Bradford and Kristina Ayers for Kaiser Foundation Hospitals as Amicus Curiae on behalf of Defendants and Appellants.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld and Joanna S. McCallum for Dignity Health and Adventist Health System/West as Amici Curiae on behalf of Defendants and Appellants.

Horvitz & Levy, David S. Ettinger, H. Thomas Watson and Peder K. Batalden for Good Samaritan Hospital, L.P., Los Robles Regional Medical Center, San Jose Healthcare System, L.P., Riverside Healthcare System, L.P., West Hills Hospital and Fountain Valley Regional Hospital & Medical Center as Amici Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine and Terri D. Keville for Scripps Health, Sharp HealthCare and St. Joseph Health as Amici Curiae on behalf of Defendants and Appellants.

Jana N. DuBois; Davis Wright Tremaine, Terri D. Keville; Arent Fox, Lowell C. Brown, Debra J. Albin-Riley and Jonathan E. Phillips for California Hospital Association as Amicus Curiae on behalf of Defendants and Appellants.

DiCaro, Coppo & Popcke, Carlo Coppo, Michael R. Popcke and Shelley A. Carder for Beta Healthcare Group as Amicus Curiae on behalf of Defendants and Appellants.

Law Offices of Stephen D. Schear, Stephen D. Schear; Justice First and Jenny Huang for Plaintiff and Respondent.

Center for Legal Affairs, Francisco J. Silva and Long X. Do for California Medical Association and American Medical Association Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joseph M. Quinn
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, CA  94105
(415) 777-3200

Lowell C. Brown
Arent Fox
555 W. Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
(213) 629-7400

Stephen D. Schear
Law Offices of Stephen D. Schear
2831 Telegraph Avenue
Oakland, CA  94609
(510) 832-3500

Long X. Do
Center for Legal Affairs
1201 J Street, Suite 200
Sacramento, CA  95814
(916) 444-5532