Filed 6/14/16  Tripi v. Make-Up Artists & Hairstylists Guild-IASTSE Local 706

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALICIA M. TRIPI, | B259541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. EC062256) |
| v. | |
| MAKE-UP ARTISTS & HAIR STYLISTS GUILD-IATSE LOCAL 706 et al., | |
| Defendants and Appellants. | |

        APPEAL from an order of the Superior Court of Los Angeles County, John P. Doyle, Judge.  Reversed in part, affirmed in part, and remanded.

        Reich, Adell & Cvitan, Laurence S. Zakson and Aaron G. Lawrence for Defendants and Appellants.

        Law Office of Michael J. Ponce and Michael J. Ponce for Plaintiff and Respondent.

Plaintiff and respondent Alicia M. Tripi sued appellant and respondent Make-Up Artists and Hair Stylists Guild of the International Alliance of Theatrical Stage Employees (IATSE), Local 706 (hereinafter the Union)[1] and seven current or former Union officers or directors for discrimination and retaliation in violation of the California Fair Employment and Housing Act (FEHA). The Union and the individual defendants appeal from the trial court's denial of their special motion to strike the complaint pursuant to Code of Civil Procedure section 425.16[2] (anti-SLAPP motion). We reverse in part and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Tripi and the Union*[3]

Tripi, a 61-year-old Hispanic hairstylist, is a member of, and represented for purposes of collective bargaining by, defendant Union. The Union represents a collective bargaining unit of approximately 1,800 makeup artists and hairstylists in the entertainment industry. Tommy Cole was the Union's Business Representative, and Susan Cabral-Ebert was the Union's President and Assistant Business Representative.

a. *First EEOC complaint*

On July 13, 2010, Tripi filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging that the Union had discriminated against her based on her gender, national origin, and age, and had retaliated against her.

---

[1]     Respondent Union's full name is Make-Up Artists and Hair Stylists Guild of the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL-CIO, CLC.

[2]     All further undesignated statutory references are to the Code of Civil Procedure.

[3]     The facts appear to be largely undisputed and are taken from the parties' briefs, the allegations of Tripi's complaint, and the declarations and materials offered in support of or opposition to the anti-SLAPP motions.

2

b. *Tripi's charges of breach of fiduciary duty by Local Union leaders and the November 21, 2010 membership meeting*

In September 2010, Tripi filed a "petition" with the Union's Executive Board alleging that Cole and Cabral-Ebert had committed multiple breaches of their fiduciary duties in violation of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 501(b).[4] She demanded an investigation and an accounting and sought to recover damages. In response, the Executive Board conducted two days of hearings and an extensive document review investigating Tripi's complaints. A number of witnesses were called before the Executive Board, including Tripi. However, Tripi declined to answer any questions unless posed in writing so she could review them with an attorney. Michael Blake, on behalf of the Executive Board, ordered Tripi to answer but she continued to refuse. Blake subsequently prepared a report containing the Executive Board's findings that Tripi's charges against Cole and Cabral-Ebert were lacking in merit. The Executive Board presented the report to the local Union's general membership at a November 21, 2010 meeting attended by approximately 90 to 100 members. Tripi, as well as others, spoke. The general membership voted to approve the no merit findings by a vote of 73 to 2.

c. *Charges against Tripi*

Lydia Milars and Michael Germain, two of the Executive Board members who investigated Tripi's allegations against Cole and Cabral-Ebert, filed internal union charges against Tripi based on her refusal to answer questions during the investigation. That "Affidavit of Charges" averred that Tripi's conduct was a violation of the local

---

**4** Among other things, Tripi averred that Cabral-Ebert was involved with the Hollywood Chamber of Commerce, and Cole was involved with the Academy of Television Arts and Sciences, in a manner that compromised the local Union's interests, including "spending 706's hard earned Union Dues on Pro-Business/Anti-Union advocacy activities"; Cabral-Ebert inappropriately held multiple positions within the Union; Cabral-Ebert spent Union money to fund an expensive trip to Washington D.C. that was not in the Union's best interests; and both had used frequent flyer miles accrued on Union business for their personal advantage.

3

Union's Constitution. On April 3, 2011, the local Union held a hearing on the charges against Tripi and convicted her of them.

d. *Second EEOC complaint*

On March 17, 2011, Tripi filed a second charge with the EEOC alleging that the Union had retaliated against her for filing the first EEOC complaint. The EEOC dismissed both the first and second EEOC charges and issued Tripi right-to-sue letters.

e. *May 22, 2011 general membership meeting*

On May 22, 2011, the Union held another meeting. The general membership voted to uphold the trial board's conviction of Tripi on the internal union charges brought for her refusal to answer questions during the investigation.

f. *Debate about the proposed collective bargaining agreement*

In 2012, IATSE reached a tentative agreement for an industry-wide collective bargaining agreement (CBA) covering the Los Angeles area and Los Angeles-based productions. The Union set up a Facebook forum, the "2012 IATSE Contract Forum," to allow IATSE members to discuss the proposed CBA. The forum was open to thousands of IATSE members, and the merits of the proposed CBA were debated on the Facebook site. Tripi posted a number of comments urging members to reject the proposed CBA. It was eventually ratified by the Union membership.

2. *Tripi's complaint in Los Angeles Superior Court*

In 2014, Tripi filed a seven-count first amended complaint (hereinafter "complaint") against the Union and individual defendants Lydia Milars, Michael Germain, John Rizzo, John E. Jackson, Leonard Engelman, Michael Blake, and Hazel Catmull, who were all current or former Union officers.[5] The complaint alleged five causes of action against the Union: retaliation for filing the first EEOC complaint (Gov. Code, § 12940, subd. (h)); age, national origin, and sex discrimination in violation

---

[5] According to the complaint, Milars, Germain, and Rizzo were members of the Union's Executive Board. Jackson was the Union's Secretary-Treasurer and Blake was the Vice President. Catmull was the "Co-Chair" of the Union's Board of Trustees. Engelman was a former Business Representative for the Union.

of the FEHA (Gov. Code, § 12940, subd. (b)); and failure to prevent discrimination and harassment (Gov. Code, § 12940, subd. (k)).[6] Tripi alleged one cause of action against the individual defendants for aiding, abetting, and inciting harassment of her in violation of the FEHA (Gov. Code, § 12940, subd. (i)). As pertinent here, the complaint alleged the following.[7]

a. *Age discrimination*

The Union maintains an "availability list" whereby Union members are referred for possible job assignments. Pursuant to Union policy, jobs are referred to trainees first and the most experienced Union members last. This policy has a disproportionate impact on older Union members, who are denied job assignments. This consequence was intentional, and designed to recruit newer Union members who pay new membership dues.

b. *National origin and sex discrimination*

Between December 2008 and March 2012, the Union approved "double dipping work" for a White Union member whose dues were delinquent, and allowed her to serve as a steward in violation of Union policy. Executive Board Member Randy Sayer waived the member's delinquent dues. At the same time, Tripi, a Hispanic whose dues were current, was "black listed." Sayer's "past incidents with Hispanic women" indicated discriminatory conduct against Hispanic women. In 2006, Sayer was allegedly fired from his job as a Department Head Hair Stylist on a television show and replaced by a Hispanic woman. Upon learning he was fired, Sayer flew into rage and was escorted off the studio lot. Despite the Union's knowledge of this incident, it hired Sayer as an Assistant Business Representative. Further, "[a]nother female Hispanic Union member"

---

[6] A seventh cause of action for failure to preserve records was not the subject of the anti-SLAPP motion and is not relevant here.

[7] Although the complaint's factual allegations are assertedly common to all causes of action, for clarity's sake we group them by reference to the causes of action to which they logically pertain.

had alleged the Union had discriminated against her because of her gender and national origin.

　　c. *Retaliation*

　　(i) *The Union's alleged efforts to "blacklist" Tripi and prevent her from obtaining work*

In November 2011 Tripi was working as a hairstylist on the televisions series "The Mentalist." Union member Sharisse Fine was the production's head hair stylist. Fine asked Tripi if she was suing the Union and mentioned Cabral-Ebert and Cole. Fine thereafter failed to hire Tripi. Another hair stylist informed Tripi that Fine had not hired Tripi because Fine did "not want any problems with the Union or Cabral-Ebert," and because Tripi was suing the Union.

On February 29, 2012, Geri Baker hired Tripi to replace another hair stylist for a single day, March 1, 2012, on a television pilot. Baker left to pay her Union dues at the Union's offices. There, Cabral-Ebert told Baker that Tripi was " 'crazy' " or mentally ill; had cost the Union and Local 706 members thousands of dollars in legal fees; was suing the Union; and had filed complaints with the EEOC and the Labor Board. Cabral-Ebert told her not to hire Tripi if she did not want trouble. Baker warned Tripi to be careful of Cabral-Ebert and the Union officers because "they could and will hurt you very bad." Baker had not hired Tripi since.

When Tripi's work as a hairstylist on a television production ended, she entered her name on the Union's Availability List on February 6, 2013. Since that date, she had not received any job referrals from the Union Dispatch office. Cabral-Ebert allegedly controls the Union's Dispatch Job Referral Office. Tripi believed she had been "black listed" by the Union due to her national origin and age and in retaliation for filing her EEOC complaints. She also believed her name had been added to a special list of persons whom the Union would not send on job assignments. The Union also gave potential employers an incorrect telephone number for her. The Union dispatcher purposely failed to refer jobs from the Availability List in alphabetical order to ensure Tripi was not called for work. Cole and Cabral-Ebert had "made defamatory statements"

6

about her to entertainment agents, with the result that she was unable to get an interview with an agent.

Tripi was "informed and believe[d]" that Cabral-Ebert made the following statements about her, at unspecified times, to "other former Executive Board Members": " 'no one is going to hire [Tripi]' "; " 'the Union had the word out on her' "; Tripi would " 'not get any work' "; " '[n]o one wants to get on the wrong side' " of Cabral-Ebert and Cole; and " '[w]e got her on the list.' " Cole had made similar remarks about her.

(ii) *Statements allegedly made at the November 21, 2010 membership meeting*

At the November 21 membership meeting Catmull stated that Tripi was " 'an enemy of Local 706' "; had filed complaints against Local 706 with the EEOC and the National Labor Relations Board (NLRB), costing the Union $100,000 in unnecessary legal fees; and all members of the Local were therefore "involved" in Tripi's lawsuit. Cabral-Ebert publicly agreed with these statements. Blake stated that " 'because of Alicia Tripi, Local 706 had to buy a new paper shredder machine and a new office copier' and 'there are mounds and mounds of unnecessary paper waste in the office.' " Engelman called Tripi "a nobody," a " 'dissident,' " and "an enemy of the Union"; questioned how she could live with herself; urged " '[d]o not go with what this [d]issident says for she is not what the Union represents' "; stated that the Union needed " 'to be protected from' " Tripi; and reiterated that the local had spent $100,000 to "protect itself from Alicia Tripi." Rizzo stated that Local 706's Constitution did not allow members to have an attorney, presumably during the investigation into Tripi's charges against Cole and Cabral-Ebert; Tripi knew she was not allowed to have an attorney; and Tripi had had a chance to speak and defend herself, but did not. These comments allegedly were intended to, and or did, harm her reputation, harass her, and prevent her from being hired by fellow Union members who had hiring authority.

(iii) *Statements made on the Facebook page*

In postings to the Facebook page in May 2012, Blake accused Tripi of posting " 'misleading' and 'completely false' information"; stated she was " 'dream[ing] up' allegations of possible nefarious actions by Union officials"; had posted " 'rant[s]' "

7

comprised of " 'delusions' she 'conjure[d] up' "; and had filed " 'numerous false & misleading claims (some are outright lies) with the NLRB & EEOC against our local without providing one single shred of evidence to support her delusional exclamations.  ALL of them have been refuted as having no basis, yet it has cost our local $100,000 in legal fees to respond.' "  Blake's comments were allegedly designed to imply Tripi was "crazy and unbalanced and not to be believed or taken seriously."

(iv)  *The Affidavit of Charges against Tripi*

The "Affidavit of Charges" filed against Tripi by Milars and Germain, and allegedly processed by Jackson, was meritless and intended to embarrass and harass Tripi.

3.  *The anti-SLAPP motions, opposition, and ruling*

The individual defendants filed an anti-SLAPP motion seeking to strike the sixth cause of action for "aiding, abetting, and inciting harassment."  The Union filed a separate anti-SLAPP motion seeking to strike the first through fifth causes of action for retaliation, discrimination on the basis of age, national origin and sex, and failure to prevent discrimination and harassment; it also joined the individual defendants' motion.

The individual defendants argued that Tripi's sixth cause of action was based solely on their acts in furtherance of their protected right of free speech in connection with public issues, i.e., the statements in union meetings and on the Facebook forum and the filing of the Affidavit of Charges.  The Union similarly argued that the first through fifth causes of action arose out of protected activity.  Appellants averred that Tripi could not demonstrate a probability of success on any of her causes of action.

In support of the motions, defendants produced the declarations of Blake, Jackson, Sayer, and Cole, which described much of the background information discussed in section 1 of our discussion of the facts, *ante*.  In addition to those matters, as relevant here, Jackson declared that as the Local Union's Secretary-Treasurer, he was responsible for processing internal union charges and election protests.  Tripi unsuccessfully ran for an internal union office in 2006 and 2009.  She filed four protests with the Union challenging the election; they were considered and dismissed. Tripi ran again for office in

2012, and filed unsuccessful election protests in connection with that election. She had also filed charges with the NLRB in 2006, 2010, and 2011. The proposed CBA was the subject of considerable news coverage because of its importance to the entertainment industry. Attached to Jackson's declaration were copies of articles published in the Los Angeles Times, Variety, and Deadline Hollywood, concerning the IATSE's ratification of the CBA.

Blake described the Facebook forum debate between him, Tripi, and other persons. Copies of the relevant Facebook posts were attached to Blake's declaration.

Sayer averred that Rizzo stated at the May 22, 2011 meeting that the Local's constitution did not allow members to have an attorney at a trial board hearing; Tripi knew this rule; and Tripi declined to speak in her own defense at the trial board hearing in regard to the charges brought against her. A copy of the minutes of the May 22, 2011 meeting was attached to Sayer's declaration.

After considering the parties' briefing, the trial court denied appellants' anti-SLAPP motions. It concluded that appellants failed to establish the subject claims arose out of protected activity, i.e., there was an insufficient showing the gravamen of the claims involved statements made in connection with an issue of public interest. Relying in part on *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 (*Rivero*), the trial court reasoned: "the gravamen of the First Amended Complaint here -- whatever the evidence may eventually establish-- is that defendants engaged in conduct directed at one employee, to harass her, retaliate against her and prevent her from being offered work in the industry. The basis of these causes of action is not that the Union took particular positions on public issues, but rather that various statements were made for allegedly ulterior motives, directed at harassing and retaliating against plaintiff, one member, raising issues unique to her circumstances, not issues which applied to the Union or to union members generally. This action is accordingly more in the nature of *Rivero,* and its overall rationale. [¶] The reply attempts to broaden the issues to include the ratification of a proposed 2012 industry-wide collective bargaining agreement. This may have been a point of contention between

9

the parties, but it does not constitute a basis for, let alone the gravamen of, the pleading before this court." The trial court did not reach the question of whether Tripi had established a probability of success on her causes of action. It declined to rule on appellants' objections to Tripi's evidence offered in opposition to the anti-SLAPP motions, finding the objections irrelevant in light of its ruling.

Defendants timely appeal the trial court's order. (§§ 904.1, subd. (a)(13), 425.16, subd. (i).)

DISCUSSION

1. *The anti-SLAPP statute*

"Code of Civil Procedure section 425.16 provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3; *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312, 315.) Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Section 425.16, subdivision (e) sets forth four types of communications or conduct that are considered acts in furtherance of a person's right of speech or petition: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right

10

of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e); see *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823-824.)

A determination whether a cause of action must be stricken under section 425.16, subdivision (b)(1), involves a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) " 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425. 16, subdivision (e).' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88; *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1466.) Second, if the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim. (*City of Cotati, supra,* at p. 76.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra,* at p. 89.)

We review an order on an anti-SLAPP motion de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055.) We consider the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); *Navellier v. Sletten, supra,* 29 Cal.4th at p. 89; *People ex rel. Fire Ins. Exchange v. Anapol, supra,* 211 Cal.App.4th at p. 822.) But we neither " 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) Section 425.16 should be broadly construed. (*Club Members for an Honest Election v. Sierra Club, supra,* 45 Cal.4th at p. 315; § 425.16, subd. (a).)

11

2. *Application of section 425.16 here*

Appellants contend the trial court erred by denying their anti-SLAPP motions. They aver that each of Tripi's causes of action "arises from" their protected activities, that is, statements made in furtherance of their free speech and petition rights in three fora: (1) at the November 21, 2010 membership meeting; (2) on the Union's Facebook page; and (3) in the internal union "Affidavit of Charges" filed against Tripi. Further, appellants urge that Tripi has not met her burden to show a probability of success on her causes of action.

Tripi, on the other hand, argues that her causes of action arise from appellants' violation of California's antidiscrimination laws, not protected activity, and in any event she has established a probability of prevailing on her complaint. She urges that the "basis of [her] causes of action is not that the Union or the Individual Appellants took particular position[s] on public issues, but rather that the various statements were made and directed at harassing and retaliating against" her alone, and did not concern issues of importance to Union members generally.

a. *Protected activity*

Primarily at issue here is the fourth category of protected conduct or communication listed in section 425.16, subdivision (e): conduct or speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e).) It is well settled that "[a]lthough matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650, disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5; *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 115 (*Du Charme*); *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.) Section 425.16 does not define "public interest," but the term "has been broadly construed to include private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity."

(*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736, 737 (*Hailstone*); *Ruiz v. Harbor View Community Assn., supra,* 134 Cal.App.4th at p. 1468.)  Thus, a public issue exists where statements pertain to a person or entity in the public eye, to " 'conduct that could directly affect a large number of people beyond the direct participants,' " or to a topic of widespread, public interest.  (*Hailstone, supra,* at p. 737; *Rivero, supra,* 105 Cal.App.4th at p. 924.)

To qualify as a public interest, the matter should be of concern to a substantial number of people; there should be a "degree of closeness" between the challenged statements and the asserted public interest; and the focus of the speaker's conduct should be the public interest, not a private controversy.  (*Hailstone, supra,* 169 Cal.App.4th at p. 736.)  Where the issue is of interest to a limited but definable portion of the public, such as a private group or organization, "the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance."  (*Du Charme, supra,* 110 Cal.App.4th at p. 119; *Ruiz v. Harbor View Community Assn., supra,* 134 Cal.App.4th at p. 1468.)  Under section 425.16, subdivision (e), private communications concerning issues of public interest may be protected whether or not made in a public forum.  (*Hailstone, supra,* at p. 736.)

     (i)  *The Facebook forum*

Applying the foregoing principles, it is clear Blake's statements made on the Facebook forum were protected activity under section 425.16, subdivision (e).  Blake explained in his declaration that the Facebook page was created specifically so IATSE members could debate the merits of the proposed CBA.  The CBA was an industry-wide agreement, of importance, and open to, thousands of IATSE members.  Indeed, according to Tripi's complaint, the forum was open to "at minimum over 113,000 IATSE members."  The terms of a proposed collective bargaining agreement – which determines crucial issues such as wages and working conditions -- were doubtless of great interest to this large group of union members.  Appellants' evidence demonstrates that the proposed

CBA was of public interest beyond the Union membership, in that the Los Angeles Times and Variety, among other publications, published articles regarding it.

The copies of the Facebook posts provided by appellants, portions of which we set forth in the margin,[8] demonstrate that Blake's comments were made in the course of an ongoing and vigorous debate about the merits of the proposed CBA and bore the requisite "degree of closeness" to that topic. (See *Hailstone, supra,* 169 Cal.App.4th at p. 736.) Blake's statements that Tripi had provided false and misleading information, and his characterization of her argument as a "rant," directly pertained to the controversy about the proposed CBA's terms. In context, it is also clear that Blake's reference to Tripi's prior unsubstantiated complaints was meant to demonstrate that her arguments about the CBA were inaccurate.

---

[8]    Blake's statements at issue were made in the following context. Tripi posted several lengthy arguments vehemently opposing the proposed CBA. Among other things, she averred that union members would be paid minimum wage ($8 per hour); many Union members had no choice but to accept the $8 per hour rate or be kicked out of the union; and the CBA inappropriately classified feature films as "New Media." She voiced frustration that the union negotiators, who were "guaranteed six figure salaries" along with all the perks, were encouraging acceptance of the proposed contract. Blake replied that Tripi had provided false and misleading information, and rebutted her statements about the characterization of feature films, salaries for union representatives, and members being "kicked out" of the Union. Tripi posted an anecdote about her personal experience being offered minimum wage; provided an excerpt from a "Low Budget Theatrical Agreement"; exhorted members not to be "bullied by those with the lavish six figure salaries who do not have to live with the consequences" of the CBA; and posted a cartoon of a man holding a money bag with the heading "Chamber PAC Boss [Union stamp for sale]." In response, Blake stated that Tripi's "rant" was "old and redundant" and she should "[t]ry debating the FACTS and not what your delusions conjure up." Tripi replied: "Blake: Gobbledy-Gook." Another poster stated, "Huh? I enjoy Alicia Tripi. Keep on tweaking!" Blake replied, "Sadly, Alicia tends to glom onto one subject with information that is based on nothing but what she believes, facts be damned. She has filed numerous false & mis-leading claims (some are outright lies) with the NLRB & EEOC against our local without providing one single shred of evidence to support her delusional exclamations. ALL of them have been refuted as having no basis, yet it has cost our local $100,000 in legal fees to respond."

14

Citing *Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, Tripi argues that because she was not a public figure, was not a Union officer, and was not on the committee that negotiated the Union's CBA, the debate about the CBA was not a matter of public interest. But *Price* is distinguishable. There, a small group of union members posted flyers in a plant manager's neighborhood. The union was in the process of negotiating a new CBA that would have covered workers at that plant, but the manager had no involvement in that process. One of the flyers did not reference the labor dispute at all; the flyers were distributed to persons who had no connection with, and no interest in, the union negotiations, in an area away from the plant. The mere fact statements in the flyer were prepared and distributed by the Union did "not turn the Union's personal attack on [the manager] into" a matter of public interest. (*Id.* at pp. 973-974.) Thus, *Price* does not stand for the proposition that the debate about a collective bargaining agreement is unprotected activity. In sharp contrast to *Price,* here Tripi was directly involved in debating the merits of the CBA.

Appellants have met their burden to demonstrate the Facebook forum posts were protected activity under section 425.16, subdivision (e).

(ii) *The November 21, 2010 meeting*

Likewise, statements made at the November 21, 2010 general membership meeting were protected activity under section 425.16, subdivision (e) as conduct in furtherance of the exercise of free speech in connection with an issue of public interest.

*Hailstone v. Martinez, supra,* 169 Cal.App.4th 728 and *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, are instructive. In the former, Hailstone was employed as a business agent by a Teamsters Local Union that represented over 10,000 workers. The Union suspended him for " 'double-dipping' " on expense reimbursements, a breach of his fiduciary duties. The local's Secretary-Treasurer, Martinez, sent copies of a letter containing the allegations to other union officials and the Department of Labor, and spoke with others about the allegations. (*Hailstone*, *supra*, at pp. 732-734.) Hailstone's employment as the local's business agent was terminated, but he remained in other union-related positions. Hailstone sued for defamation, and the Union responded with an anti-

15

SLAPP motion. (*Id.* at p. 734.) The appellate court concluded the defendants had met their burden to establish the allegedly defamatory statements were protected activity under section 425.16, subdivision (e). (*Hailstone, supra,* at pp. 735-736.) When Martinez first published the "double dipping" accusations, the investigation was ongoing and Hailstone still held other union positions related to representation of the local. "Hailstone's alleged misappropriation of union funds was of interest, not only to the union officials to whom the allegedly defamatory statements were made, but also to a definable portion of the public, i.e., the more than 10,000 members of Local 948. The statements were made in connection with an ongoing controversy that was significant to the Local 948 members, i.e., an investigation by Local 948's elected representatives into the possibly illegal actions of a union official who was currently serving in a fiduciary capacity as a trustee of the trust that provides health and welfare benefits to those members." (*Id.* at p. 738; cf. *Du Charme*, *supra,* 110 Cal.App.4th at p. 118 [statement posted on local's website that business manager had been removed for financial mismanagement was not a matter of public interest, because the statement was merely informational; the termination was a fait accompli and was unconnected to any discussion, debate or controversy].)

In *Macias,* the court concluded that allegedly defamatory campaign statements made during a union election affecting 10,000 members involved a public issue. (*Macias v. Hartwell, supra,* 55 Cal.App.4th at p. 672.) Macias had been fired from her local union position for misuse of union funds. She subsequently ran for president of the local. Her opponent distributed a flyer stating Macias had been terminated for misconduct. (*Id.* at p. 671.) *Macias* reasoned that under the federal LMRDA, every member of a labor organization has the right to express his or her views concerning candidates in a labor election. (*Id.* at p. 673; 29 U.S.C. § 411(a)(2).) "Where, as here, a candidate speaks out on issues relevant to the office or the qualifications of an opponent, the speech activity is protected by the First Amendment. [Citation.] 'The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. "*Public discussion about the qualifications of those who hold or wish to hold positions of*

16

*public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment.*" ' " (*Macias*, *supra*, at p. 673, italics added; see also *Damon v. Ocean Hills Journalism Club, supra,* 85 Cal.App.4th at p. 479 [statements concerning plaintiff's competency to manage homeowners association pertained to issues of public interest within the 3,000-resident community, in that they involved "the very manner in which" the group would be governed, an "inherently political question of vital importance to . . . the community as a whole"].)

At the November 21, 2010 meeting, the general union membership was asked to consider the Executive Board's findings on allegations that two of the local's high-ranking leaders had breached their fiduciary duties. These accusations, made by Tripi, necessarily placed before the general membership the questions of Cole and Cabral-Ebert's qualifications to continue to hold office and consideration of whether they had engaged in serious improprieties. As in *Macias* and *Hailstone,* allegations of this ilk present an issue of public interest to the organization as a whole, that is, to the approximately 1,800 Union members represented by Local 706. Although the Executive Board had completed its investigation, at the meeting it presented the substance of the charges to the Local's membership for approval. According to Jackson's supplemental declaration, at the meeting there was a "long discussion of Tripi's charges, including comments by many members, including Tripi herself," and the general membership voted on whether to approve the Board's findings. The discussion related to the political question of whether the Union's elected leaders were governing properly, and warranted "protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (See *Du Charme, supra,* 110 Cal.App.4th at p. 119.)

Tripi argues that statements allegedly made by Engelman, Catmull, Blake, and Rizzo at the November 21 meeting[9] do not qualify as protected activity because they did

---

[9]    Tripi argues that the Union's opening brief mischaracterizes the November 21, 2010 meeting and the Board's investigation into her allegations against Cole and Cabral-Ebert as "Internal Union Trials." She contends there was no formal trial during the investigation into her complaints, and the November 21 meeting was "a discussion on a

17

not directly pertain to the Board's findings or her accusations against Cole and Cabral-Ebert. But this characterization of the alleged statements is too constricted. In essence, the comments attributed to the individual appellants (1) disclosed that Tripi had filed complaints with the EEOC and NLRB; (2) disclosed that the Union had expended considerable sums on legal fees and other expenses addressing her complaints, which came from Union dues; (3) criticized Tripi for filing unsubstantiated charges that depleted the Union's resources and were harmful to the Union; (4) criticized Tripi for failing to cooperate with the investigation into the charges she had initiated; and (5) urged the membership to disagree with Tripi (" '[d]o not go with what this [d]issident says for she is not what the Union represents' "). Comments 4 and 5 pertained directly to the investigation, criticizing Tripi for failing to cooperate and urging the membership to reject her allegations. The remaining comments, read in context, were comments on Tripi's credibility, which was relevant to the accuracy of her accusations. Tripi, after all, was responsible for the accusations against Cole and Cabral-Ebert, and discussion of her credibility and veracity was therefore potentially related to the merits of the charges. To the extent comments 1 – 3 were simply criticisms of Tripi's conduct, statements that a Union member has repeatedly filed meritless complaints that deplete union resources is certainly a matter of public interest to the Union's membership.

Tripi urges that this matter parallels *Rivero, supra,* 105 Cal.App.4th 913, a case the trial court cited in support of its ruling. Rivero, a janitorial supervisor, was suspended after several of his subordinates accused him of theft, extortion and favoritism. Although the allegations could not be substantiated, he was terminated. The Union to which the subordinates belonged thereafter distributed documents containing allegedly false information about Rivero and touting the success of the Union members in orchestrating Rivero's departure. Rivero sued the Union for libel and slander and the Union responded

---

motion brought to 'accept the findings of the Executive Board,' " rather than a trial. Our analysis does not hinge on these distinctions. We assume the November 21 meeting was a meeting rather than a formal trial proceeding, and the investigation into Tripi's accusations was just that – an investigation during which Tripi was questioned.

with an anti-SLAPP motion. (*Id.* at pp. 916-917.) *Rivero* affirmed the trial court's denial of the motion on the ground the Union had failed to show Rivero's allegations arose from speech in connection with a public issue. (*Id.* at pp. 918, 924.) The court reasoned: "the Union's statements concerned the supervision of a staff of eight custodians by Rivero, an individual who had previously received no public attention or media coverage. . . . [T]he only individuals directly involved in and affected by the situation were Rivero and the eight custodians. Rivero's supervision of those eight individuals is hardly a matter of public interest." (*Id.* at p. 924.) The dispute between Rivero and his subordinates was an isolated incident and not part of a larger union dispute, and did not qualify as protected activity. (*Id.* at p. 927.)

Tripi argues that as in *Rivero,* in the instant matter there is no major labor dispute; only the individuals directly involved in the internal union dispute are affected, and none are persons in the public eye; and the statements at issue involved only the ongoing functions of a labor union rather than an issue of public interest. We disagree. As we have explained, the issues here – resolution of accusations that Union leaders had breached their fiduciary duties to the Union, an issue that encompassed their qualifications and suitability to hold office – impacted the entire local membership, not just a few members.

(iii) *The Affidavit of Charges*

The Affidavit of Charges filed by Milars and Germaine and processed by Jackson, and Rizzo's comments related to Tripi's alleged refusal to answer questions,[10] likewise constituted protected speech and conduct under section 425.16, subdivision (e). Under some circumstances, a charge that a Union member failed to abide by the local's

---

**10**    According to the complaint, Rizzo's comments were made at the November 21, 2010 meeting. The Union has presented evidence that Rizzo made the comments not at the November meeting, but at the May 22, 2011 meeting in which the membership voted on the charges against Tripi. Our analysis of Rizzo's alleged comments is the same regardless of whether the statements were made at either the November or the May meeting.

constitution or by-laws might present an issue of interest only to the few individuals involved. (See *Rivero, supra,* 105 Cal.App.4th at p. 924.) Here, however, the charges against Tripi arose directly from the Union's investigation of Tripi's accusations against the Union leadership and was inextricably intertwined with it. As we have explained, those accusations – involving alleged breach of fiduciary duty by Cole and Cabral-Ebert, and therefore their qualifications to continue to hold office – were an issue of public interest to the local's large group of members. Her conduct in regard to the investigation of her accusations against the Union leadership was of interest to the Union membership, which had a stake in the Union's governance, as well as in the question of whether Tripi's accusations were brought in good faith and properly investigated. The question of Tripi's conduct was discussed and put to a vote of the general membership at the May 22, 2011 meeting. Under these circumstances, the act of filing the Affidavit of Charges and statements made therein or related thereto were also matters of public interest and protected activity. (See *Ruiz v. Harbor View Community Assn., supra,* 134 Cal.App.4th at pp. 1468, 1470 [private letters between attorney for homeowner's association and homeowner regarding dispute about architectural approval were protected communications; they were related to the homeowner's conduct at the association's board meeting, the dispute and the application of the architectural guidelines were of interest to the homeowner community, and the homeowner's "conduct at [association] board meetings and interaction with board members affected [the association's] governance and therefore would also be of interest to community members"].)[11]

b. *The "arising from" requirement*

The trial court, while recognizing that "the claims to some extent arise out of comments made in a public forum," denied the anti-SLAPP motion on the ground

---

[11]     Appellants argue that the November 21, 2010 meeting and the "Affidavit of Charges" fall within section 425.16, subdivision (e) as statements or writings made in connection with an "official proceeding authorized by law," or are protected as pre-litigation activity. In light of our conclusion that the statements fall within subdivision (e), we need not reach these questions.

appellants failed "to establish that the subject claims arise out of protected activity, that is, it has not been established that the gravamen of the claims involves statements made in connection with an issue of public interest."

"The anti-SLAPP statute applies only to a 'cause of action . . . arising from' acts in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 186.) The "statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.) "In assessing whether a cause of action arises from protected activity, ' "we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action.' " ' " (*Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1520.) "We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." (*Ibid.*) "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman, supra,* at p. 78; *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 66.) The anti-SLAPP statute's definitional focus is not the form, label, or "essence" of the plaintiff's cause of action but "rather, the defendant's *activity* that gives rise to his or her asserted liability— and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 92; *People ex rel. Fire Ins. Exchange v. Anapol, supra,* 211 Cal.App.4th at p. 823; *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 267.)

On the other hand, "a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. [Citation.] . . . [W]hen the

allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez v. Metabolife Internat., Inc*., *supra,* 113 Cal.App.4th at p. 188; see *People ex rel. Fire Ins. Exchange v. Anapol, supra,* 211 Cal.App.4th at p. 823.) "That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such." (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.)

(i) *The retaliation and aiding and abetting causes of action arise from protected activity*

Tripi's sixth cause of action for "aiding, abetting and inciting harassment," alleged against the individual defendants, arises solely from protected activity. Tripi's complaint alleges that Milars, Germain, Rizzo, Jackson, Blake, Catmull, and Engleman "intended to and did aid, abet or incite the Union in its harassment of" her in violation of Government Code section 12940, subdivisions (b) (discrimination), (h) (retaliation), and (k) (failure to take reasonable steps to prevent discrimination and harassment), and that their actions were designed to "taint her and prevent her from being hired by other Union members." The only acts alleged in support of this cause of action are the protected activities discussed *ante,* that is, defendants' statements at the November 21, 2010 or May 11, 2011 meetings; the comments on the Facebook forum; and the filing of the Affidavit of Charges. Indeed, Tripi acknowledges that her "claim against the Individual Appellants is based entirely upon speech by the Individual Appellants." The gravamen of the sixth cause of action is that the individual defendants aided and abetted the Union in harassing Tripi and discriminating against her by making statements that caused other Union members not to hire her. (See *Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 396 [gravamen is defined by the acts on which liability is based].) Defendants' alleged statements were not merely incidental, or evidence of harassment; they *were* the harassment. They were not merely evidence of retaliation; they were the acts alleged to be retaliatory. In short, the only acts underlying

22

the sixth cause of action were themselves acts in furtherance of the rights of free speech and petition. (See *City of Cotati, supra,* 29 Cal.4th at p. 78.)

The acts alleged as the basis for the first cause of action for retaliation in violation of the FEHA, alleged against the Union, are that the Union discriminated against Tripi for filing an EEOC complaint by "blacklisting" her and damaging her reputation. She avers that the Union's retaliatory policies and practices included "making and allowing defamatory statements by officers and members as alleged herein; by insuring Tripi did not get referrals from the Availability List; maintaining Tripi on a list of Union members who were not to be given job assignments; and by bringing false and unmerited charges against her." The Union's actions were "designed to negatively taint her and prevent her from being hired by other Union members."

Thus, Tripi's first cause of action is based upon some acts that constitute protected activity (statements by the individual defendants that were allegedly defamatory and/or damaged Tripi's reputation, and the filing of the Affidavit of Charges), and some that are not (the use of the availability list, the maintenance of her name on the nonreferral list, and other forms of "blacklisting"). Where a cause of action is based on both protected activity and unprotected activity (a "mixed" cause of action), it is subject to section 425.16 unless the protected conduct is merely incidental to the unprotected conduct. (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1187; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287-1288; *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1551.) An alleged act is incidental to a claim "only if the act is not alleged to be the basis for liability." (*Wallace v. McCubbin, supra,* at p. 1183.) That the protected activity comprises a relatively small proportion of the wrongdoing alleged is not dispositive. (*Haight Ashbury Free Clinics, Inc.,* at pp. 1552-1553.)

The protected activities alleged as the basis for the first cause of action are not merely incidental; the acts are alleged to be part of the basis for the Union's liability. The communications at issue are allegedly retaliatory and the Union's liability is premised upon them. These alleged acts of retaliation cannot be merely incidental to a cause of

23

action for retaliation. (See *Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1187.) As with the sixth cause of action, the retaliation claim is based upon, and arises from, the protected activities of the individual defendants. (See *City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.) The first cause of action thus arises from protected activity.

Tripi argues to the contrary that her retaliation claim does not arise from the Executive Board's report or its findings on her accusations, or from a position the Union took on a public issue. Instead, she contends, the gravamen of her complaint is that the Union violated California's antidiscrimination laws, defendants singled her out for harassment and retaliation, the individual defendants aided and abetted the Union in violating the FEHA, and the statements at issue are merely evidence of appellants' "retaliatory animus" and harassment.

We disagree. *Wallace v. McCubbin* provides helpful analysis of Tripi's contention. As *Wallace* explained, "the first prong of analysis under the anti-SLAPP statute focuses on the acts on which liability is based, not the gestalt of the cause of action." (*Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1175.) In *Wallace,* the plaintiffs argued that their causes of action arose from unlawful discriminatory efforts to oust them from their apartment, rather than from the protected activities of, inter alia, an unlawful detainer action and service of a three-day notice. *Wallace* rejected this view, reasoning: "One need look no further than the language of the anti-SLAPP statute to conclude that [plaintiffs'] gestalt theory is incorrect. According to subdivision (b)(1) of section 425.16: 'A cause of action against a person arising from any *act* of that person in furtherance of the person's right of petition or free speech' is subject to a motion to strike. . . . From this language, it is clear that we must look at the nature of the specific '*act*' that allegedly gives rise to the cause of action, not the gestalt or gist of the allegations generally. [Citation.] [¶] Indeed, our Supreme Court has made clear that the statutory language focuses on acts: 'In short, the statutory phrase "cause of action . . . arising from" means simply that the defendant's *act* underlying the plaintiff's cause of action must *itself* have been an *act* in furtherance of the right of petition or free speech. [Citation.]' [Citation.] We are admonished to examine the act underlying the

cause of action, not the gist of the cause of action. [¶] Furthermore, while it is often said that the first prong of the anti-SLAPP analysis calls us to ascertain the 'gravamen' of the cause of action, for anti-SLAPP purposes this gravamen is defined by the *acts on which liability is based*, not some philosophical thrust or legal essence of the cause of action." (*Id.* at pp. 1189-1190; see also *Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at pp. 268-269 [trial court erred by conflating defendants' motive in a discrimination case with the conduct itself].)

Nor do we agree that the protected activity at issue here is merely "evidence." "[A] court ruling on an anti-SLAPP motion must distinguish between allegedly wrongful acts and evidence of those acts. 'Where the defendant's protected activity will only be used as evidence in the plaintiff's case, and none of the claims are based on it, the protected activity is only incidental to the claims,' and will therefore not support an anti-SLAPP motion." (*People ex rel. Fire Ins. Exchange v. Anapol, supra,* 211 Cal.App.4th at p. 823.) Obviously, acts giving rise to a cause of action will have evidentiary value, but that does not mean the cause of action is not also based upon those acts. Here, as we have explained, the protected acts themselves are alleged to constitute retaliation, and are not merely evidence of retaliation. (See *Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1183 ["It makes no sense for [plaintiffs] to argue that their cause of action for defendants' attempt to evict them wrongfully is not based on defendants' alleged attempt to evict them"]; *Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 270 [in the absence of the protected conduct, plaintiff's gender discrimination claims would have no basis].)

Tripi cites *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273 (*Alta Loma*), *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, and our opinions in *Santa Monica Rent Control Bd. v. Pearl Street, LLC* (2003) 109 Cal.App.4th 1308 (*Pearl Street*), and *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, in support of her contention that the gravamen of her causes of action is discrimination and retaliation, which does not arise from the protected conduct.

25

In *Alta Loma,* a landlord decided to remove its apartment building from the rental market. One of its tenants asserted she was disabled and sought extension of the period during which she might find alternate housing. After the tenant failed to provide confirmation of her disability, the landlord had the tenant removed through an unlawful detainer action. The Department of Fair Employment and Housing (DFEH) sued the landlord for disability discrimination, and the landlord brought an anti-SLAPP motion. (*Alta Loma, supra,* 154 Cal.App.4th at pp. 1275-1276.) The trial court denied the motion because the gravamen of the complaint was for disability discrimination, and therefore the suit did not arise from the landlord's petitioning or free speech rights. Its ruling was upheld on appeal. (*Id.* at p. 1276.) The appellate court assumed the landlord's act of prosecuting its unlawful detainer action against the tenant constituted protected activity. (*Id.* at p. 1283.) But the gravamen of the DFEH's action was "not an attack on any act Alta Loma committed during the rental property removal process or during the eviction process itself." (*Id.* at p. 1284.) Instead, the allegations of wrongdoing arose from Alta Loma's alleged acts of failing to accommodate the tenant's disability. "The [communications] and filing of unlawful detainer actions constituted DFEH's *evidence* of Alta Loma's alleged disability discrimination. In other words, DFEH might well have filed the same lawsuit had Alta Loma simply ignored [the tenant's] claim of disability and requests for extension of her tenancy without any communication . . . and simply filed a complaint for unlawful detainer." (*Id.* at pp. 1284-1285.)

In *Pearl Street,* a rent control board sought a judicial determination of the maximum rent defendant landlords could charge for two apartments, and the landlords brought an anti-SLAPP motion. (*Pearl Street, supra,* 109 Cal.App.4th at pp. 1311, 1315.) We assumed that the landlords' activities of filing paperwork to restore two units to the rental market were undertaken in furtherance of their rights of petition or free speech. (*Id.* at p. 1318.) However, "defendants were not sued for their conduct in exercising such constitutional rights. They were sued by the Board to compel their compliance with the provisions of the rent control law. [¶] Thus, while this suit may have been 'triggered by' defendants' submission of such documents to the Board, it is *not*

26

true that this suit is *based on* the filing of such papers. Rather, the suit is based on activity that preceded the filing of the papers. *This suit is based on the Board's claim that defendants are charging an illegal rent for units A and C.*" (*Ibid.*)

In *Gallimore,* the plaintiff alleged State Farm had engaged in claims handling misconduct in connection with the Northridge earthquake, in violation of the Business and Professions Code. The complaint alleged that the Department of Insurance (DOI) had investigated and found violations in State Farm's claims files. State Farm contended the plaintiff's allegations were based upon and arose from confidential written reports that it had filed with the DOI, which amounted to protected activity. (*Gallimore v. State Farm Fire & Casualty Ins. Co., supra,* 102 Cal.App.4th at pp. 1391-1393.) We concluded that the trial court had "confused allegations of wrongdoing with the evidence required to prove them," and reversed the order granting the motion. (*Id.* at pp. 1391, 1399.) Although the DOI report may have triggered the action, the action did not arise from the report or from any communication by State Farm to the DOI. (*Id.* at p. 1399.) The complaint sought to call State Farm to task for claims handing misconduct and violation of statutory and regulatory rules; it did not allege that any communication between State Farm and the DOI was "wrongful or the cause of any injury." (*Ibid.*)

Finally, in *Jespersen v. Zubiate-Beauchamp,* a legal malpractice case, an anti-SLAPP motion was properly denied because the suit was based on the attorneys' failure to comply with a discovery statute and court orders. Thus, the "alleged attorney malpractice did not consist of any act in furtherance of anyone's right of petition or free speech, but appellants' negligent *failure* to do so on behalf of their clients." (*Jespersen v. Zubiate-Beauchamp, supra,* 114 Cal.App.4th at p. 631.)

Here, in contrast to these cases, the protected speech is alleged as among the very acts constituting retaliation, the cause of action at issue. Tripi, unlike the plaintiffs in the cited cases, does contend the protected activities were themselves wrongful and seeks to recover damages for them. In the absence of the protected activity, Tripi's claims against the individual defendants would not exist. As we have explained, the cause of action for retaliation against the Union arises from acts of retaliation, i.e., the allegedly retaliatory

27

statements and the internal union charges filed against Tripi, among other things. (See *Wallace v. McCubbin, supra,* 196 Cal.App.4th at pp. 1191-1192 & fn. 10 [distinguishing *Alta Loma* and *Pearl Street*].)

(ii) *Second through fourth causes of action for age, national origin, and sex discrimination*

We come to a different conclusion in regard to Tripi's second through fourth causes of action for age, national origin, and sex discrimination. Tripi's second cause of action for age discrimination alleges that she was a qualified member of the union; age was a motivating factor in the Union's decision to discriminate against her; and the Availability List guidelines adversely and disproportionally impacted Union members over 40. The complaint expressly lists the "facts that support [an] inference of age discrimination"; the protected activities are not among them. Instead, the allegations concern the Availability List and the distribution of job assignments.[12]

Similarly, the complaint does not allege that the protected activities are the basis for the third cause of action for national origin discrimination or the fourth cause of action for sex discrimination. The factual allegations of the complaint contain, under a separate heading entitled "disparate treatment by Union against Tripi based on national origin," the allegations regarding the White Union member who allegedly obtained extra work despite her dues delinquency, and the allegations regarding Sayer's reaction to being replaced with a Hispanic woman. Contrary to appellants' contentions, reading the complaint in a fair and commonsense fashion, it is apparent the second through fourth causes of action do not arise from the protected activity.[13]

---

[12]   The Union argues that the trial court struck the complaint's allegations regarding the Availability List, with leave to amend, because Tripi did not include such allegations in her EEOC complaint. Be that as it may, the point is that the allegations underlying the second cause of action do not arise from the protected speech. The question of whether the age discrimination cause of action is viable is not before us.

[13]   Of course, this analysis necessitates the conclusion that, should any of Tripi's causes of action proceed, she cannot premise them on the protected activities.

28

Appellants argue that the protected activity made up a material part of the factual predicate of *each* of the claims against the Union because each cause of action incorporates by reference all factual allegations in the complaint, as well as all preceding paragraphs addressing the specific causes of action. However, a fair and commonsense reading of the complaint suggests otherwise. We decline to base our analysis of whether each cause of action "arises" from the protected conduct on this constricted and technical reading of the complaint.

Appellants also argue that Tripi failed to expressly argue below that her discrimination claims are not based on protected activity, and therefore her contentions in this regard assert a new theory and must be deemed to have been waived. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.) We disagree. Tripi's argument below was that none of the causes of action arose from protected activity. That she has provided a more focused argument in this regard on appeal does not, on the circumstances presented here, indicate she has materially changed her theory as appellants suggest.

(iii) *The fifth cause of action*

Tripi's fifth cause of action against the Union is for failure to prevent discrimination and harassment. Insofar as this cause of action is based on allegations that the Union failed to prevent the retaliation alleged in cause of action 1, or the "aiding, abetting, and inciting harassment" alleged in cause of action 6, it is derivative of those causes of action and the anti-SLAPP motion should have been granted. To the extent the fifth cause of action pertains to Tripi's causes of action for age, national origin, and sex discrimination, and is based on conduct other than the protected activities we have discussed *ante,* the trial court's ruling was correct.

3. *Remand for consideration of the second prong of the section 425.16 analysis*

Based on its ruling that Tripi's causes of action did not arise out of protected activity, the trial court did not undertake an analysis of the second prong of the section 425.16 analysis, that is, whether Tripi met her burden to demonstrate a probability of prevailing on her claims. The trial court also found it unnecessary to rule on appellants'

numerous objections to Tripi's evidence offered in opposition to the anti-SLAPP motion, concluding that the objections were irrelevant in light of its ruling.

Appellants observe that this court has the discretion to decide the question and request that we do so. (See *Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1195 [an appellate court may remand the matter to the trial court to conduct the second-prong analysis, but has discretion to conduct the analysis itself].) In our view, remand is the more appropriate procedure here. As explained in *Collier v. Harris* (2015) 240 Cal.App.4th 41, a "few appellate courts have decided the matter when a quick decision was necessary," for example when a contract was set to expire or when the parties disagreed on how the second prong should be applied. (*Id.* at p. 58 and authorities cited therein.) "The majority of appellate courts, however, have declined to do so either because contested evidentiary issues existed or simply because it was appropriate for the trial court to decide the issue first." (*Ibid.*) Moreover, rulings on the evidentiary objections are necessary to determine whether Tripi has presented admissible evidence demonstrating a probability of success on the first and sixth causes of action. "Rulings on evidentiary objections involve an exercise of discretion, and it is the trial court's responsibility to rule on the objections in the first instance." (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1348.) Appellants have failed to offer any persuasive reason why we should not allow the trial court to rule on the second prong in the first instance, especially in light of the unresolved challenges to Tripi's evidence. "[W]hen we decide a matter in the first instance, we deprive the parties of a layer of independent review available to them when the matter is decided initially by the trial court. We think it best that the able and experienced trial judge decide the issue." (*Collier v. Harris, supra,* at p. 58.)

## DISPOSITION

The trial court's order is reversed insofar as it pertains to the first and sixth causes of action. As to the fifth cause of action, the trial court's order is reversed insofar as the fifth cause of action derives from the first and sixth causes of action, and is affirmed insofar as the fifth cause of action derives from the second, third, and fourth causes of action. The order is affirmed insofar as it pertains to the second, third, and fourth causes of action. The matter is remanded for further proceedings in accordance with the opinions expressed herein. Appellants Milars, Germain, Rizzo, Jackson, Blake, Catmull, and Engelman are awarded costs. The Union and Tripi shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.



We concur:



EDMON, P. J.



HOGUE, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.